782 P.2d 91
**STATE of New Mexico,**
**Plaintiff–Appellee,**

v.

**Charles Robert MOORE,**
**Defendant–Appellant.**

**No. 10836.**

Court of Appeals of New Mexico.

Aug. 29, 1989.

Certiorari Denied Oct. 18, 1989.

**122**

Hal Stratton, Atty. Gen., Katherine Zinn, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Jacquelyn Robins, Chief Public Defender, Jerry Todd Wertheim, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

MINZNER, Judge.

Defendant appeals from judgment and sentence on conviction after a jury trial. He asserts on appeal that the trial court erred in: (1) denying his motion to suppress a pistol seized by police and statements made to the police about the pistol; (2) denying his motion to suppress the in-court identification testimony of the two victims; (3) allowing the state's peremptory challenge of the only black member of the jury venire; (4) imposing consecutive sentences for two counts of armed robbery and for two counts of false imprisonment; and (5) denying his motion for a change of venue. We conditionally affirm, but we remand for a hearing with respect to the third issue.

Defendant's third issue was not raised in his docketing statement. During an extension of his briefing time, defendant moved to amend his docketing statement, claiming the issue was properly preserved below. Defendant had not, however, sought or secured an extension of time in which to move to amend, as most appellants now routinely do when they seek an extension of briefing time. The state claims defendant's motion is untimely. Defendant asserts the motion was made as soon as

counsel discovered the issue on the tapes, which were lost until they were filed during the extension of briefing time. Defendant also contends the issue involves fundamental error. The state disagrees.

We take this opportunity to clarify the law relating to amending the docketing statement. We hold the motion was timely and that, notwithstanding that the motion may not have shown good cause for amending the docketing statement, we grant it nonetheless because we believe it is fairer to make our pronouncements in this case prospective. We discuss the motion to amend as the last issue in the opinion.

## BACKGROUND

This case arises out of an early evening robbery at the home of Ken and Ann Batson in Hobbs, New Mexico, as the Batsons were returning to their home. Mrs. Batson pulled into the garage, and Mr. Batson parked behind her. Mrs. Batson went into the house to turn off the burglar alarm, and Mr. Batson walked across the lawn to pick up the paper. As Mr. Batson turned to walk back into the garage, a tall, thin, black man with a gun jumped out from beside the house. A second man appeared, and the tall, thin man and his companion escorted Mr. Batson into the garage. As the tall, thin man came around Mrs. Batson's car, he pulled a stocking mask over his face. Mrs. Batson first saw the tall, thin man as she was going back into the garage and he was pulling the stocking mask over his face. At some point a third man appeared, and the men then escorted the Batsons into the house. At first they kept the Batsons in the hallway, and the tall, thin man guarded them while the others searched the house. The men handcuffed the Batsons together and bound them with duct tape. After searching the house, the men took guns, cash, and jewelry away with them. The men were at the house approximately ten to fifteen minutes.

A few days later members of the Hobbs Police Department entered the house where defendant was staying for a few weeks. The house was rented and occupied by Malora Lacy. Although the police

had a search warrant, it is undisputed on appeal that it was invalid.

Both defendant and Ms. Lacy were present when the police arrived, and Ms. Lacy invited the police to enter. Once inside, Detective Knott sat at the kitchen table with Ms. Lacy, while other officers made a protective sweep. While the other officers were occupied, Ms. Lacy told Detective Knott that there was a gun under her bed, that defendant had given her the gun and some money, and that he said he had obtained the money and the gun in a robbery. Subsequently, Mr. Batson identified the gun as one taken during the robbery.

The Batsons saw defendant before trial. Mr. Batson saw him the day the preliminary hearing was postponed and again on the day of the rescheduled hearing six weeks later. Mrs. Batson saw defendant at the preliminary hearing. There was conflicting evidence on the issue of whether either victim saw defendant at the police station.

At trial, as well as at the preliminary hearing, the Batsons identified defendant as the tall, thin man who had held them at gunpoint. The record indicates defendant is six feet, two inches tall, weighs about 150 pounds, and is missing one eye.

Defendant was convicted of the five counts with which he had been charged: one count of aggravated burglary, contrary to NMSA 1978, Section 30–16–4 (Repl. Pamp.1984) and NMSA 1978, Section 31–18–16 (Repl.Pamp.1987); two counts of armed robbery, contrary to NMSA 1978, Section 30–16–2 (Repl.Pamp.1984) and Section 31–18–16; and two counts of false imprisonment, contrary to NMSA 1978, Section 30–4–3 (Repl.Pamp.1984) and Section 31–18–16. Defendant was sentenced to nine years on each of the three second degree felony counts and to eighteen months on both fourth degree felony counts. The trial court ordered that his sentences be served consecutively.

## SUPPRESSION OF THE PISTOL AND MS. LACY'S STATEMENTS

■ Defendant's motion to suppress contended that the evidence obtained by police at the home of Ms. Lacy was the fruit of an unreasonable search and seizure under the fourth amendment. The record does not support defendant's contention. The trial court was entitled to find that Ms. Lacy voluntarily disclosed the location of the pistol as well as what defendant had told her. Under these circumstances, the trial court did not err in denying defendant's motion to suppress. *See State v. Barry*, 94 N.M. 788, 617 P.2d 873 (Ct.App. 1980). Once defendant disclosed inculpatory evidence to a third person, he could not prevent that person from divulging the information in willing cooperation with a police investigation. *See United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). In this case, defendant waived any expectation of privacy he might otherwise have had.

## SUPPRESSION OF THE VICTIMS' IN-COURT IDENTIFICATION OF DEFENDANT

■ Defendant contends that the in-court identification of defendant by the victims should not have been allowed because there had been various pre-trial confrontations that were impermissibly suggestive. *See State v. Torres*, 81 N.M. 521, 469 P.2d 166 (Ct.App.1970). Even if there has been an improper extra-judicial identification, this fact does not require the exclusion of an independent in-court identification, which is not tainted by the prior identification. *Id.* We understand defendant's argument to be that the in-court identifications were tainted by suggestive and unreliable extra-judicial identifications. We disagree.

■ In this case, the trial court did not indicate whether it found there had been pre-trial confrontations or, if so, whether they had been impermissibly suggestive. Even where the trial court has found pre-trial confrontations were suggestive, however, the circumstances may support a finding that the identifications were sufficiently reliable to support a conclusion that the in-court identification was not tainted. *See State v. Nolan*, 93 N.M. 472, 601 P.2d 442

(Ct.App.1979). Based on the evidence offered at the motion to suppress hearing and at trial, the trial court was entitled to find that the in-court identifications were reliable. Thus, the trial court did not err in denying defendant's motion to suppress them.

■ The relevant factors supporting the reliability of the in-court identification include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description, the level of certainty demonstrated at the time of the confrontation, and the time elapsed between the crime and the confrontation. These factors are to be weighed against the potentially corrupting effect of the suggestive identification. *See Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Nolan.* Under the relevant factors, the trial court could have found that the out-of-court identifications were sufficiently reliable to deny suppression of the in-court identification.

There is no question that the Batsons had ample time, in well-lit areas, to observe the man who held them at gunpoint while the others ransacked other rooms. They both testified at trial that the man kept threatening to blow their heads off if they looked at him and that this induced them to look at him more often. They also testified that they were "100 percent" certain of their identification of defendant because of their observation at the time of the crime. Mrs. Batson testified that, in spite of the stocking mask, she saw the man's facial features clearly. Both testified that they immediately and unquestionably recognized defendant when they saw him after the robbery in the magistrate courthouse. It is unclear exactly when the pre-trial confrontations occurred, but there is no question that they occurred between January 3, 1987, the date of arraignment, and February 23, 1987, when the preliminary hearing was finally held, from five days to seven weeks following the robbery.

Defendant argues that the victims failed to report that the tall, thin man was missing an eye. For this reason and others, he contends that the descriptions given the police were highly inaccurate. We disagree.

Although Mr. Batson saw the tall, thin man for a few moments before he pulled a stocking over his face, the man wore the stocking for most of the time that the victims had an opportunity to view his face. Mr. Batson testified that, although he noticed something was wrong with the perpetrator's eye, he thought it was caused by the stocking pulling the eye down. This is a plausible explanation for his failure to tell police about his observation. Mrs. Batson, on the other hand, told police that the stocking made the perpetrator look like he had a "gotch-eye," which she explained meant that the eye looked deformed; something seemed to be wrong with it. There would be no reason for her to describe such a deformity if all she thought she saw was distortion caused by the mask.

■ In considering the totality of the circumstances, it would be inappropriate for the trial court or this court to be concerned with minor inaccuracies in the victims' initial descriptions. Thus, for example, we believe it is not dispositive that Mr. Batson incorrectly estimated defendant's weight at 180 pounds. Having reviewed the circumstances known to the trial court, we conclude the trial court could have found the in-court identifications were reliable and independent of suggestive pre-trial confrontations.

## THE STATE'S PEREMPTORY CHALLENGE

During voir dire, the state began with the following series of questions:

Q: Have any of you people been questioned about contacts with the police department? Do any of you have family or close friends that have been a defendant in a criminal action, in a felony, let's start with a felony criminal action, that you know of? So no one here would have any leanings against the police department because of other dealings with someone in their family then?

Nothing further was said regarding this voir dire until the trial court, outside the presence of the jury, considered challenges for cause and peremptory challenges. Upon inquiry from the trial court, counsel for the state and defendant indicated that they had no challenges for cause. The trial court then asked for peremptory challenges. The state sought to strike only Ms. Goree, the only black member of the venire. If the state had not successfully challenged her, Ms. Goree would have been the twelfth juror chosen. The tape reveals the following colloquy during jury selection in chambers:

Ct: Number 25, Kay Goree.

P: State strike, your Honor. And also for the record your Honor, we would ... be willing to strike her based on information we have from ... outside sources that she had relatives in the penitentiary. She responded "no" to that question concerning whether or not she had specifically relatives who had ever been criminal defendants and that would be the basis for that strike.

D: I want to note that Ms. Goree is the only black juror we have. And the question was, I don't recall the exact question but, I think she answered it properly.

Ct: I'm going to allow the strike.

Defendant contends that when the prosecutor peremptorily struck the only black juror in the venire, he was denied his right to equal protection of the law secured by the fourteenth amendment. On the present record, we are not able to evaluate the merits of this contention. We explain in the discussion that follows.

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court reaffirmed the principle that a " 'State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause.' " *Id.* at 84, 106 S.Ct. at 1716, quoting *Swain v. Alabama,* 380 U.S. 202, 203–04, 85 S.Ct. 824, 826–27, 13 L.Ed.2d 759 (1965). The *Batson* majority significantly modified the rules applicable to a prosecutor's use of peremptory challenges in criminal cases. The Court held a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of the state's peremptory challenges in the defendant's case. This was a modification of the rule in *Swain,* which courts had interpreted to mean that a defendant must show systematic exclusion of minorities from the juries in other cases as well as his or her own case.

 This court first applied *Batson* in *State v. Sandoval,* 105 N.M. 696, 736 P.2d 501 (Ct.App.1987). As noted in *Sandoval, Batson* imposes on defendant the obligation to establish a prima facie case of discriminatory purpose. He (1) must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of his racial group, (2) may rely on the fact that peremptory challenges constitute a jury selection practice that permits those who are of a mind to discriminate to do so, and (3) must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their shared race. If defendant makes this showing, the necessary inference of purposeful discrimination arises. In considering whether defendant has made the required showing, the trial court should consider all relevant circumstances. *See State v. Jim,* 107 N.M. 779, 765 P.2d 195 (Ct.App.1988); *State v. Hall,* 107 N.M. 17, 751 P.2d 701 (Ct.App.1987). Once the defendant makes a prima facie showing, the burden shifts to the state to come forward with a neutral explanation.

 Under *Batson,* the trial court has multiple obligations if a prima facie showing is made. The court must evaluate the showing, require an explanation from the prosecutor if it determines a prima facie showing is made, evaluate the explanation, and ultimately determine if defendant has carried the burden of persuasion.

In *State v. Goode,* 107 N.M. 298, 756 P.2d 578 (Ct.App.1988), this court most re-

cently discussed the factors to be considered in determining whether a prima facie case of discriminatory challenges has been made. In that case, the court also discussed the state's obligation to provide a racially neutral explanation for challenging members of the defendant's racial group. Defendant contends that under *Goode*, a prima facie case was made, and the explanation given was insufficient to dispel the inference that it was racially motivated. Defendant also argues that under *Goode*, to the extent further inquiry is necessary to determine the sufficiency of the explanation, the trial court failed in its obligation to examine the explanation and determine whether it was genuine.

■ We agree with defendant that the prima facie showing required of him was probably present and could have been made. *See id.* However, the record on appeal is not sufficient to allow us to determine what the trial court's ruling actually meant. On these facts, we cannot say the trial court implicitly found defendant failed to make a prima facie case or that the court found defendant's prima facie showing adequate but found the prosecutor's pre-challenge statements were sufficient to overcome the inference of discriminatory conduct. We are not even sure that the trial court in fact understood defendant was raising a *Batson* issue. We conclude the case must be remanded for a hearing. *See Batson v. Kentucky; State v. Jones*, 293 S.C. 54, 358 S.E.2d 701 (1987).

■ Under *Batson*, *Goode*, and *Sandoval*, the trial court's determination of whether defendant has made a prima facie case is a factual determination, not a question of law. As an appellate court, we cannot make that determination initially. Further, the trial court's determination of whether defendant has made a prima facie showing is the mechanism by which the prosecutor becomes obligated to give a further explanation. Until the court makes that determination, the prosecutor may not have notice that the burden of production has shifted. *See People v. Turner*, 42 Cal.3d 711, 728–29, 230 Cal.Rptr. 656, 667,

726 P.2d 102, 113 (In Bank) (Panelli, J., concurring).

■ Similarly, the trial court must evaluate the explanation offered in response to the trial court's request and decide whether defendant has carried the ultimate burden of persuasion. If the constitutional guarantee articulated in *Batson* is to have real meaning, the trial court must play a primary role. The role of the appellate court is to review the trial court's factual findings and legal conclusions.

■ We cannot hold as a matter of law that the state's "advance explanation" satisfied the *Batson* requirement for a race-neutral explanation. The burden that shifts to the state is a burden of production. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In Title VII cases, it has been said that placing the burden of production on defendant, who is analogous to the state in this context,

> serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Id.* at 255–56, 101 S.Ct. at 1094–95. We believe the same analysis applies to the race-neutral explanation required of the prosecutor under *Batson*.

The explanation given at trial was that Ms. Goree did not respond truthfully to the voir dire question. On appeal the state relies on Ms. Goree's failure to admit her relationship to persons in the penitentiary as its reason for the challenge. Thus, we assume the state contends that she had not responded truthfully, because she had been asked whether she was related to persons in the penitentiary and had not responded with the information the prosecution possessed.

■ The state is correct that there is "nothing inherently suspect" in its use of

outside sources to gain information about jurors. However, if Ms. Goree was singled out for special inquiry because she is black, the inquiry itself was racially motivated. Defendant may be correct in suggesting that inquiry was made into Ms. Goree's family on the assumption that, because she is black, there was a good chance that she had relatives in the penitentiary; a reverse assumption may have been made about white panel members. If defendant is correct, then the explanation given by the state would be race-related, and the reason given would be linked to the prosecution's assumption based on race.

If the prosecution had treated Ms. Goree differently from white panel members, that would have been a strong indication that the reason given for the challenge was not genuine and that the challenge was made for discriminatory purposes. *See Gamble v. State*, 257 Ga. 325, 357 S.E.2d 792 (1987) (varying treatment of white and nonwhite panel members a significant factor in determining whether state's explanation is pretextual). *See also Floyd v. State*, 511 So.2d 762 (Fla.Dist.Ct.App.1987) (black student challenged because prosecutor did not like to have students on jury, but white student not challenged); *People v. Turner* (black juror made mistakes in answering long, extremely formal voir dire question; white jurors who also made mistakes not challenged).

■ *Batson* lightens the evidentiary burden imposed on defendants, but it does not eliminate defendant's obligation to alert the trial court to the facts on which the prima facie case depends. In an appropriate case, the *Batson* rules shift the burden of producing a satisfactory explanation to the prosecutor. They also impose an obligation on the trial court to evaluate the explanation and, if the reasons given are either implausible or suggestive of bias, to make further inquiry. Under these rules, the trial court's ruling on the sufficiency of defendant's prima facie case has important procedural consequences. Because of these procedural consequences, in the future we will expect a defendant who wishes to raise a *Batson* issue to clearly make a prima facie case that shifts the burden of production. Here, it is arguable that defendant did not make his case with sufficient clarity to shift the burden of production. Nevertheless, we think he said enough to merit a hearing. *See State v. Jones*. Thus, we remand to permit defendant to state the facts on which he relies and for the trial court to make the necessary rulings. If the trial court ultimately finds that defendant carried his burden of persuasion, defendant's conviction must be set aside, and a new trial ordered. If not, his conviction will stand.

## CONSECUTIVE SENTENCING ON TWO COUNTS OF ARMED ROBBERY AND TWO COUNTS OF FALSE IMPRISONMENT

■ Defendant contends that the trial court erred in ordering his sentences on armed robbery and false imprisonment to run consecutively, because, on the facts of this case, the offense of false imprisonment merged into the armed robbery offense. Merger is an aspect of double jeopardy. *State v. Gammil*, 108 N.M. 208, 769 P.2d 1299 (Ct.App.1989). Double jeopardy applies to subsequent prosecutions; merger applies to the concept of multiple punishments when multiple charges are brought in a single prosecution. *Id.* The test to determine whether one offense necessarily includes another also requires an examination of the statutory elements of each offense in light of the evidence and the particular facts of each case. *Id.* (citing *State v. DeMary*, 99 N.M. 177, 655 P.2d 1021 (1982) and *State v. Sandoval*, 90 N.M. 260, 561 P.2d 1353 (Ct.App.1977)).

■ In this case, the evidence showed that both Batsons were robbed by the use of force by someone armed with a deadly weapon. *See* § 30–16–2. The evidence also showed that each was confined or restrained without consent and without lawful authority. *See* § 30–4–3. Since the elements of the two crimes are dissimilar and the evidence required to establish each crime is independent, it is clear the crimes do not merge even when considered in light of the facts. *See State v. Corneau*, 109

N.M. 81, 781 P.2d 1159 (Ct.App.1989). Further, there were separate and distinct offenses as to each victim. Where there are multiple victims, the societal harm is greater. *State v. Johnson,* 103 N.M. 364, 707 P.2d 1174 (Ct.App.1985). The evidence showed four separate acts, so defendant's sentence was not unlawful. *See generally State v. Dunlop,* 721 P.2d 604 (Alaska 1986) (majority of states have held that multiple punishments for multiple victims of single criminal act do not violate double jeopardy).

## CHANGE OF VENUE

Defendant moved for a change of venue, on the ground that the reputation and influence of the victims, prejudice against blacks in the county, and extensive media coverage made a fair trial impossible. The trial court denied the motion and made specific findings that a fair and impartial trial was possible.

■ Defendant asks this court to consider whether the trial court abused its discretion by using facts not alleged in the motion to decide the motion. He also asks us to consider whether the facts used were so irrelevant as to make the trial court's decision an abuse of discretion. We conclude the trial court did not abuse its discretion. Co-defendant's acquittal was not irrelevant to the court's decision and was not improperly considered. *See* SCRA 1986, 11–201(C) (a judge or court may take judicial notice, whether requested to or not).

## MOTION TO AMEND THE DOCKETING STATEMENT

■ The last issue we must confront is the timeliness of defendant's motion to amend the docketing statement. Our cases hold that motions to amend in cases assigned to a nonsummary calendar must be made during original briefing time. *State v. Hicks,* 105 N.M. 286, 731 P.2d 982 (Ct. App.1986). This rule originated in *State v. Jacobs,* 91 N.M. 445, 575 P.2d 954 (Ct.App. 1978), and was adopted as a means of limiting amendments to docketing statements to those that would not be contrary to the

concepts behind the rules of appellate procedure. Foremost among those concepts is that the issues are to be raised by the trial attorney, not by the appellate attorney after picking through the transcript for possible error. *Id.; see also State v. Ramming,* 106 N.M. 42, 738 P.2d 914 (Ct.App.1987).

After *Jacobs,* we decided *State v. Rael,* 100 N.M. 193, 668 P.2d 309 (Ct.App.1983). *Rael* outlines the procedure to be used in attempting to amend the docketing statement. Although *Rael* did not alter the timeliness requirement, it added some more substantive provisions designed to limit amendments to docketing statements and to insure that motions to amend were not being filed contrary to concepts underlying the appellate rules. The more substantive provisions make the time limitation set forth in *Jacobs* appear technical and mechanistic.

If the goal is to prevent the raising of issues by the appellate attorney after picking through the transcript for possible error, it is difficult to see how a rule allowing amendments during original briefing time achieves that goal. The requirements of *Rael* are much more efficient at limiting amendments of docketing statements. Moreover, as a practical matter, most appellants represented by experienced counsel now routinely accompany their motions for extension of briefing time with motions for extension of time to file motions to amend. In light of *Rael*'s more efficient way of limiting docketing statement amendments, we no longer see the utility of a rule which distinguishes between those amendments allowed to be granted and those not granted on the basis of factors relating to the experience of the appellant's attorney rather than on factors relating to whether the purposes of the rules are served.

■ Therefore, we overrule *Jacobs* and subsequent cases to the extent they hold that motions to amend the docketing statement must be made within the original briefing time. Hereafter, motions to amend will be considered timely for cases assigned to the nonsummary calendar when they are filed with the brief-in-chief.

Similarly, motions to amend will be considered timely for cases assigned to the summary calendar when they are filed with the party's first memorandum in opposition to the proposed disposition in the calendar notice. *See State v. Smith*, 102 N.M. 350, 695 P.2d 834 (Ct.App.1985).

By adopting this position, we do not abandon our commitment to the principle that issues raised by the appellate attorney after picking through the transcript are disfavored. Accordingly, we view our holding as establishing an outside time limit beyond which the motion to amend will ordinarily be denied without considering other factors. However, the earlier a motion to amend can be filed, the more likely it will be that this court will determine the motion is being filed for reasons other than that appellate counsel discovered a new issue.

For these reasons, we hold the motion to amend was timely filed in this case. We now measure the motion to amend by the factors outlined in *Rael*. *Rael* contains two essential holdings and a recapitulation that laid out five criteria, which must be met before we will allow an amendment. The recapitulation contains some language that may have caused confusion. We take this opportunity to clarify the recapitulation and to further explain why *Rael*'s requirements are more functionally related to the showing of good cause that motivates us to exercise or not exercise our discretion to allow docketing statement amendments.

In *Rael*, we deemed two requirements to be essential to a showing of good cause for our allowance of a docketing statement amendment: (1) the motion to amend must be timely, and (2) the motion must show the new issue sought to be raised was either (a) properly preserved below or (b) allowed to be raised for the first time on appeal. *Id.* at 195, 668 P.2d at 311. Later in the opinion, we held that the issues sought to be presented must be viable. *Id.* at 197, 668 P.2d at 313. By viable, we meant to describe an argument that was colorable, or arguable, and to distinguish arguments that are devoid of any merit.

Issues range on a continuum from those that are completely devoid of merit to those that are clearly reversible error of a fundamental or jurisdictional variety. Somewhere along the continuum toward the side of the meritless issues are those issues that are not viable; in the middle are viable issues that do not result in reversible error; farther along are issues that, if properly raised, would result in reversible error.

Under *Rael* and *State v. Doe*, 92 N.M. 100, 583 P.2d 464 (1978), cited therein, it is our duty to reverse on issues of demonstrated fundamental or jurisdictional error. However, as *Rael* demonstrates, it is not every allegation of such error that will be found to amount to such error. Thus, some of the five criteria set forth in *Rael* are designed to assist us in determining whether such error in fact exists. These criteria help us in assessing the viability of the issues. Nonviable issues are not deserving of being added to the docketing statement, even if they allege fundamental or jurisdictional error.

Thus, we should deny motions to amend that raise issues that are not viable and we should grant motions to amend that raise issues of demonstrated fundamental or jurisdictional error. In between these two extremes is an area committed to our discretion. We may wish to address viable issues that do not result in reversible error for reasons concerning the development of the law. For the same reason, we may wish to address issues that are not properly raised but if properly raised would result in reversible error even if we affirm in the particular case. The *Rael* criteria will assist us in exercising our discretion in these cases. Thus, the *Rael* criteria should be addressed by counsel in each and every case in which appellant seeks to amend the docketing statement.

In this case, in terms of the two essential *Rael* holdings, the motion was timely and it alleged error that was in fact preserved; it showed an issue that was viable. In terms of the recapitulation, the motion attempted to address all criteria. Although the state does not argue against granting the motion on this ground, we note that the motion's

attempt to comply with the fourth *Rael* criterion—a showing of good cause for failure to raise the issue initially—is a simple recitation that the omission from the docketing statement was "inadvertent." We recently held, *see State v. Gallegos*, 109 N.M. 55, 781 P.2d 783 (Ct.App.1989), that merely reciting that the omission of the issue was inadvertent did not demonstrate good cause to allow a docketing statement amendment.

One can read *Rael* and *Gallegos* to say that new issues alleging jurisdictional or fundamental error should be added without a showing of good cause, i.e., that the good cause requirement applies only to other viable or reversible issues. We believe this would be an erroneous interpretation of our cases. Good cause is a basic requirement for all docketing statement amendments. SCRA 1986, 12–208(C). Good cause is established when the issue is demonstrated to be meritorious fundamental or jurisdictional error. Good cause may be established in other ways when the issue is not meritorious fundamental or jurisdictional error.

The point of *Rael*'s requirement, that the motion to amend recite the reason why the new issue was not originally raised, is to allow this court insight into trial counsel's evaluation of the issue, which may bear on our own assessment of the issue's viability. For example, there is an obvious difference between a situation in which the issue was not included because trial counsel's secretary inadvertently omitted a paragraph when typing the draft, and a situation in which trial counsel deliberately omitted the issue because he or she thought it frivolous or thought it had not been preserved.

The new issue sought to be raised in *Rael* was sufficiency of the evidence. Our discussion of the requirement at issue intimates that, in that case, we expected trial counsel to say the issue was not raised because he thought certain specific facts provided sufficient evidence. We expected to be informed of those facts, together with appellate counsel's argument about why those facts were insufficient. *See State v. Rael,* 100 N.M. at 196, 668 P.2d at 312.

*Gallegos* was decided after the motion to amend was filed in this case. The state does not argue that the motion to amend was deficient for failure to show good cause. The requirement of candidly and honestly stating why the issue was not raised earlier is designed to allow us to better exercise our discretion by assisting us in assessing the viability of an issue. In this case, we have exercised our discretion and granted the motion to amend. However, in future cases, we may well do as we did in *Gallegos* and deny motions to amend that simply recite the inadvertent omission of an issue.

## CONCLUSION

Defendant's judgment and sentence are conditionally affirmed, and the case is remanded for further proceedings not inconsistent with this decision.

IT IS SO ORDERED.

BIVINS, C.J., and CHAVEZ, J., concur.