512 P.2d 970

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**John E. HOLDEN and Tom Spikes, Defendants-Appellants**

**No. 1096.**

Court of Appeals of New Mexico.

June 20, 1973.

Certiorari denied July 18, 1973.

Charles W. Durrett, John E. Conway, Thomas A. Sandenaw, Jr., Shipley, Durrett, Conway & Sandenaw, Alamogordo, for appellant Holden.

James J. Weldon, Alamogordo, for appellant Spikes.

David L. Norvell, Atty. Gen., Thomas Patrick Whelan, Jr., Asst. Atty. Gen., Prentis Reid Griffith, Jr., Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

HENDLEY, Judge.

The defendants were tried together on separate criminal informations charging them with first degree murder. The charges grew out of the same set of facts. Defendant Holden was charged as a principal; defendant Spikes as an accessory. After a jury trial Holden was convicted of voluntary manslaughter (§ 40A–2–3(A), N.M.S.A.1953 (2d Repl. Vol. 1972)); Spikes of involuntary manslaughter (§ 40A–2–3(B), N.M.S.A.1953 (2d Repl. Vol. 1972)).

On appeal Holden raises three points; Spikes raises one. Both defendants argue that their convictions are not supported by substantial evidence. Holden's additional points raise issues of error by failure to direct an acquittal on the crimes of first and

second degree murder and by admission of a photograph of decedent.

We affirm both convictions.

On the night of July 15, 1972, decedent had a fight with Holden's sister with whom decedent was living. In the course of the fight decedent struck Holden's sister with an ashtray, causing a head wound which bled rather heavily. Holden was summoned to his sister's house after decedent's departure. There is evidence that after leaving his sister's house Holden went looking for decedent intending to beat him up. Holden did not find decedent.

The next morning Spikes, who was also related to Holden's sister, was also looking for decedent. Upon being told that decedent was in a particular cafe, Spikes said he was going " ' . . . to get a man to beat him [decedent] up. . . . ' "

Shortly thereafter Spikes drove up with Holden. Decedent and three other men were standing on the street near the cafe. When Spikes pulled up, Holden, by his own admission, " ' . . . got out of the car and I walked over and said hello to [the other men], and then I went to shooting. . . . ' " Holden had had the gun in his pocket when he drove up. Spikes stood next to the car during the shooting and watched. Holden fired three shots at decedent while decedent was standing. After decedent fell to the ground Holden stood over him and fired again. Holden then walked back to the car, got in and Spikes drove away. Decedent was pronounced dead on arrival at the hospital.

*Holden's appeal*

At trial the defense presented testimony by a clinical psychologist and a psychiatrist on the issue of Holden's ability to premeditate and deliberate. Both experts testified that, as a reasonable medical or psychological probability Holden was incapable of premeditation or deliberation at the time of the shooting. The psychologist characterized Holden as suffering from an "explosive personality disorder." The psychia-

trist diagnosed Holden as suffering from "psycho-motor epilepsy." The psychiatrist stated that his diagnosis and that of the psychologist were compatible. The state presented no expert testimony on this issue.

In his first point on appeal Holden argues that his conviction of voluntary manslaughter is not supported by substantial evidence. His argument is that under the doctrine of diminished responsibility, which was recognized in State v. Padilla, 66 N.M. 289, 347 P.2d 312 (1959), the only substantial evidence is that he was not capable of committing an intentional act, which, he argues, is a necessary element of voluntary manslaughter. Defendant raises a related issue: whether a defense of diminished responsibility in a first degree murder trial, if accepted by the jury, would in certain circumstances permit a passage to consideration of the defendant's guilt of some degree of manslaughter rather than of second degree murder. We do not find it necessary to decide this issue. See State v. Chambers, 84 N.M. 309, 502 P.2d 999 (1972). Rather we consider the defense of diminished responsibility to be analogous to that of insanity. Expert testimony on the issue of diminished responsibility by reason of mental disease or defect, like that on insanity, is not conclusive on the fact finder. State v. Moore, 42 N.M. 135, 76 P.2d 19 (1938). The jury is free to believe or disbelieve such testimony. State v. James, 85 N.M. 230, 511 P.2d 556 (1973). If such testimony is disbelieved by the jury the presumption of full responsibility, which we view as included in the presumption of sanity, remains in effect. In State v. Gardner, 85 N.M. 104, 509 P.2d 871 (1973), the Supreme Court stated that it is usually the province of the jury to weigh the evidence of insanity and determine what value, if any, to accord it. The jury's function is the same in the case of a defense of diminished responsibility. It is also true that in State v. Gardner, supra, the Supreme Court admitted the possibility that evidence of insanity may be so over-

whelming as to require the direction of a verdict of acquittal. We assume that the same may be true of evidence of diminished responsibility. However, the evidence in the present case is not of such a quality as to require a directed verdict. The issue of Holden's responsibility for the crime of voluntary manslaughter was properly submitted to the jury and the resulting conviction is supported by substantial evidence.

Holden's second point is that the trial court erred by failing to direct a verdict of acquittal of the crimes of first and second degree murder. His argument is based on the same testimony concerning diminished responsibility outlined above. Considerations similar to those previously discussed are dispositive. As we heretofore stated, the jury could have totally disregarded the expert testimony relied on to show defendant's diminished responsibility. There were concessions by both of the expert witnesses that Holden was capable of premeditation and deliberation in the ordinary affairs of life and both witnesses conceded that Holden could have premeditated and deliberated about the shooting of decedent. It was not error to permit the jury to determine Holden's liability for either first or second degree murder.

Holden's final point concerns the admission of a photograph of decedent. The photograph shows decedent's nude body lying on the autopsy table prior to the commencement of the autopsy. The photograph was used by two of the doctors who testified to identify the decedent and to illustrate the fatal injuries. Holden contends that the trial court abused its discretion in admitting the photograph because it was " ' . . . calculated to arouse the prejudices and passions of the jury and [was] not reasonably relevant to the issues of the case. . . .' " State v. Sedillo, 76 N.M. 273, 414 P.2d 500 (1966). Having reviewed the photograph and the use which was made of it at trial we cannot say as a matter of law that the trial court abused its discretion in admitting it. State v.

Coulter, 84 N.M. 647, 506 .P.2d 804 (Ct. App.1973); State v. Carlton, 83 N.M. 644, 495 P.2d 1091 (Ct.App.1972).

*Spikes' appeal*

As noted above, Spikes was charged with first degree murder (§ 40A–2–1, N.M.S.A.1953 (2d Repl.Vol. 1972)), as an accessory. (§ 40A–1–14, N.M.S.A.1953 (2d Repl.Vol. 1972)). He was convicted of the lesser included offense of involuntary manslaughter (§ 40A–2–3, supra). The fact that Spikes was convicted of a different crime than Holden is a permissible result under our accessory statute.

Spikes' argument on appeal is that his conviction was not supported by substantial evidence. As outlined above, the evidence introduced against Spikes was that he was looking for decedent; that upon locating him Spikes made a statement to the effect that he was going to get a man to beat the decedent up; and that shortly thereafter Spikes returned with Holden. Spikes drove Holden to and from the scene of the crime.

Involuntary manslaughter is defined as " . . . manslaughter committed in the commission of an unlawful act not amounting to a felony; . . . ." (§ 40A–2–3, supra). An accessory is defined as one who "procures" the commission of a crime. (§ 40A–1–14, supra). Inflicting a beating is an unlawful act.

From the evidence recited above it is obvious that there is substantial evidence that Spikes, with the intent to commit an unlawful act, procured Holden to inflict a beating on decedent. The fact that Spikes did not bargain for the result is not material. The material fact is that he did "procure" another to perform an "unlawful act." See Borrego v. State, 423 P.2d 393 (Wyo.1967).

Affirmed.

It is so ordered.

SUTIN and HERNANDEZ, JJ., concur.