853 P.2d 147

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Aaron DOMINGUEZ,**

**and**

**Robert Ortega, Defendants–Appellants.**

**Nos. 13251, 13294.**

Court of Appeals of New Mexico.

March 19, 1993.

Tom Udall, Atty. Gen., Bill Primm, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Dan Cron, Rothstein, Walther, Donatelli, Hughes, Dahlstrom & Cron, Santa Fe, for defendant-appellant Aaron Dominguez.

Susan Gibbs, Santa Fe, for defendant-appellant Robert Ortega.

## OPINION

APODACA, Judge.

Defendant Ortega's motion for rehearing having been granted, our original opinion filed November 23, 1992, is withdrawn and the following substituted for it.

Defendants have separately appealed their respective convictions for aggravated battery with great bodily harm. Because the appeals raise several common issues, we have consolidated them on this Court's own motion. *See* SCRA 1986, 12–202(F)(2) (Repl.1992). The common issues are whether the trial court erred in: (1) not requiring the state to provide racially neutral explanations for its exercise of peremptory challenges against Hispanic jurors; (2) denying defendants' motion to sever their trials from that of one of their codefendants; and (3) refusing defendants' requested jury instruction. Although defendants have taken different approaches in arguing these issues, their basic contentions are virtually identical and we shall so treat them in our discussion.

Dominguez raises the following additional issues: whether (1) sufficient evidence supported his conviction and (2) the trial court erred in denying his motion to dismiss the grand jury indictment. Another issue listed by Dominguez in the docketing statement but not briefed is deemed abandoned. *See State v. Fish,* 102 N.M. 775, 777, 701 P.2d 374, 376 (Ct.App.), *cert. denied,* 102 N.M. 734, 700 P.2d 197 (1985).

Dominguez also expressly abandoned another issue in his reply brief. Ortega also raises the issue of the legality of his sentence. Because we are unpersuaded by defendants' arguments with respect to each issue, except for Ortega's sentencing issue, we affirm both defendants' convictions. We remand for further sentencing proceedings in Ortega's appeal. Dominguez filed a motion for designation of non-documentary exhibit, which motion was held in abeyance pending submission of his appeal to a panel for disposition. We deem the exhibit unnecessary to our disposition and therefore deny the motion.

FACTS

On the night of June 29, 1989, Paul Mascarenas, Jr., and his younger brother, Eric Mascarenas, were cruising and drinking beer in Penasco, Taos, and Rodarte. Eric testified that they bought three or four quarts of beer in Taos between 8 and 9 p.m., and went to the Rodarte Tavern to buy more beer at about midnight. While Paul went into the bar, Eric and a female companion waited in the car. When Paul returned, he was not wearing a shirt and had scratches on his body. Paul and Victor Cordova, one of a total of seven codefendants (including defendants in this appeal), had engaged in a "friendly" wrestling match in the parking lot of the bar. Paul and Cordova hugged and shook hands after the match. Eric became upset when he saw his brother's condition, although Paul told him the fight was "nothing" and "stupid." Eric got out of the car and challenged some of the assembled crowd to fight. Several witnesses testified that Eric was throwing "karate kicks," none of which landed on any person.

Eric testified that, following the argument, he and Cordova began fighting in one location, and everyone else rushed Paul. Eric, a state wrestling champion, was getting the better of Cordova until he was pulled off by Dominguez and hit by Alex Valdez with a jack. Eric ran to his car to get a baseball bat. At the same time, he saw a group of men, including defendants, "hitting and kicking" at Paul. Before the fight, two witnesses saw

George Lopez, another of the codefendants, with a knife. One of them testified that Lopez, apparently referring to one of the Mascarenas brothers, said: "If he comes at me, I'll fuck him up." Other codefendants were seen with a jack or pipe that night.

After the fight involving Paul broke up, he, Eric, and their female companion drove off. Paul lost control of the car less than 400 yards away, but Eric was able to stop it to prevent an accident. Paul had been stabbed eight times and was bleeding profusely. He died as a result of the stab wounds before help could arrive. While they were stopped on the side of the road, a car containing Dominguez, Cordova, Alex Martinez, and Alfred Garcia drove by. Dominguez reportedly said: "That's what they get." The occupants of the car understood Dominguez to mean that the Mascarenas brothers were having car trouble for having caused the fight. Eric also testified that, before the fight, Dominguez yelled something in Spanish, which Eric did not understand, in a tone that sounded like cursing.

Dr. Zumwalt, the pathologist who performed the autopsy on Paul's body, testified that either of two stab wounds could have caused death. Paul also suffered numerous bruises and contusions, one of which was a "pattern" injury on his forearm, which was consistent with having been hit by a tire iron or pipe. Dr. Zumwalt said Paul did not suffer any great bodily harm apart from the stab wounds.

Defendants and the five codefendants were jointly indicted for aggravated battery and conspiracy to commit aggravated battery. George Lopez was also indicted for Paul's murder. Defendants were jointly tried with George Lopez, Herbert Lopez, and Victor Cordova. The state argued for the guilt of all defendants other than George Lopez on an aiding and abetting theory, and the jury was so instructed. Ortega and Dominguez were convicted of aggravated battery.

## COMMON ISSUES

### 1. *The State's Peremptory Challenges.*

The jury venire consisted of seventy-four persons. The trial court excused twenty potential jurors for cause. Of the fifty-four remaining jurors, forty were Hispanic and fourteen were Anglo. The judge's memorandum of petit jury selection indicated there were at least twenty-two Hispanic males on the panel of fifty-four. The first juror called, Adelina Marquez, was excused by defendants. The next juror, Manuel Mares, was peremptorily challenged by the state. Two Hispanic men, one Hispanic woman, and one Anglo woman were selected before the state used its second peremptory challenge to strike Jake Ortega. Defendants objected and asked for a racially neutral explanation for the strike. The prosecutor explained that his office had previously prosecuted Ortega and that he had failed to disclose this fact during voir dire.

Maysel Hernandez, Lawrence Fawcett, Samuel Gallegos, Raymond Trujillo, and Terry Sanchez were chosen before the state used three more peremptory challenges against Adelaido Romero, Trinidad Martinez, and Ronald Vigil. Defendants again objected and asked that the state be required to give racially neutral explanations for these challenges. The prosecutor refused, and the trial court upheld this refusal. The trial court commented that it saw no pattern of racial discrimination because the state had already accepted many Hispanics for service. None of the challenged jurors were asked any questions by the prosecutor during voir dire.

Loretta Gonzales and Ernestina Ortega were selected before the state exercised its sixth peremptory challenge against Francis Chacon.[1] Defendants renewed their objection, which was again denied by the trial court. Vincent Archuleta was chosen as the twelfth juror. Crucita Mondragon and Robert Jacobs were selected as alternates.

---

1. Although the trial court's jury selection memorandum indicates the masculine spelling of Francis, the juror was referred to as "she" during jury selection. Dominguez states that the jury questionnaire he received during voir dire indicates the juror was a male; however, the questionnaire is not part of the record on appeal. For purposes of our discussion, we assume Francis Chacon was a woman.

**450**

The jury ultimately seated consisted of six Hispanic men, four Hispanic women, and two Anglos. The alternate jurors were an Hispanic woman and an Anglo man.

In all, the state exercised six of its available seventeen peremptory strikes. Five of the six challenges were used against Hispanic men; the sixth was used against an Hispanic woman. Defendants argue that they established a prima facie case of discrimination under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), based on the state's pattern of strikes against Hispanic men. They assert that the trial court erred in not requiring the prosecutor to rebut the prima facie showing. The state, on the other hand, contends defendants did not establish a prima facie case.

■ The state's power to use peremptory challenges is limited by the Equal Protection Clause of the federal constitution. *Id.* at 84, 106 S.Ct. at 1716; *State v. Goode*, 107 N.M. 298, 300, 756 P.2d 578, 580 (Ct.App.), *cert. denied*, 107 N.M. 308, 756 P.2d 1203 (1988). A defendant may challenge the constitutionality of the state's selection of members of the petit jury when he shows he is a member of a cognizable racial group and establishes a prima facie case that potential jurors were excluded from the jury for racial reasons. *Goode*, 107 N.M. at 301, 756 P.2d at 581. Additionally, a potential juror may not be excluded on the basis of gender. *State v. Gonzales*, 111 N.M. 590, 599, 808 P.2d 40, 49 (Ct.App.), *cert. denied*, 111 N.M. 416, 806 P.2d 65 (1991).

This Court has stated that:

> To establish a prima facie case, [a] defendant must show that: (1) he is a member of a cognizable racial group; (2) the state has exercised its peremptory challenges to remove members of that group from the jury panel; [and] (3) these facts and any other relevant circumstances raise an inference that the state used its challenges to exclude members from the panel solely on account of their race.

*Goode*, 107 N.M. at 301, 756 P.2d at 581. Once a defendant makes a prima facie

showing that the state used its peremptory challenges improperly, the burden then shifts to the state to come forward with a racially-neutral explanation for its strikes. *Id.*

■ It is undisputed that defendants met the first two *Batson* criteria. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722–23. Our focus thus turns to the third factor. Some circumstances raising an inference of purposeful discrimination are: (1) a showing that the defendant's racial group is substantially underrepresented or eliminated entirely from the jury; (2) the susceptibility of the case to racial discrimination, as where the defendant and the victim are of different races; and (3) jurors of the defendant's race have been eliminated for reasons that are not applied to jurors of another race. *Goode*, 107 N.M. at 301, 756 P.2d at 581.

■ It is not necessary that all of the members of the cognizable racial group be removed or that the state use all of its peremptory challenges in order to establish a prima facie case. *Id.* Similarly, the fact that a defendant's racial group is not substantially underrepresented is not conclusive on the issue of the prima facie showing. *Id.* Striking a single juror for racial reasons violates equal protection. *Id.; see also United States v. Battle*, 836 F.2d 1084, 1085 (8th Cir.1987); *Stanley v. State*, 313 Md. 50, 542 A.2d 1267, 1283–84 (1988). In *Gonzales*, we held that an Hispanic defendant made out a prima facie case of discrimination by showing that the state exercised eighty percent of its peremptory challenges to eliminate Hispanics from the jury, even though the jury ultimately selected included four Hispanics and the state did not use all of its peremptory strikes.

■ Defendants concede that Hispanics were not underrepresented on the jury. Nor was this a case susceptible to racial discrimination because the victim, the defendants, and most of the witnesses were Hispanic. Defendants rely heavily on *Gonzales* in arguing that they established a prima facie case of discrimination. It is

undisputed that the state used its peremptory challenges to strike Hispanics. As we noted earlier, it also appears that none of the challenged jurors was individually questioned by the prosecutor on voir dire. *See State v. Aragon,* 109 N.M. 197, 201, 784 P.2d 16, 20 (1989) (prosecutor failed to engage jurors in more than a "random voir dire"); *State v. Sandoval,* 105 N.M. 696, 698, 736 P.2d 501, 503 (Ct.App.1987) (questions asked by prosecutor on voir dire should be considered in determining whether defendant has established a prima facie case); *cf. State v. Jim,* 107 N.M. 779, 782, 765 P.2d 195, 198 (Ct.App.) (fact that prosecutor failed to question Navajo on voir dire was insufficient under facts of the case to support inference of purposeful discrimination), *cert. denied,* 107 N.M. 720, 764 P.2d 491 (1988); *United States v. Young–Bey,* 893 F.2d 178 (8th Cir.1990) (fact that two stricken black jurors did not say anything on voir dire did not establish prima facie case).

We observe, however, that other circumstances tend to negate any inference of purposeful discrimination. Although the mere presence on the jury of members of the cognizable group is not conclusive, *see Gonzales,* 111 N.M. at 595, 808 P.2d at 45, such presence tends to undercut any inference of purposeful discrimination. *See United States v. Allison,* 908 F.2d 1531, 1537 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1681, 114 L.Ed.2d 77 (1991); *United States v. Dennis,* 804 F.2d 1208, 1211 (11th Cir.1986) (per curiam), *cert. denied,* 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987). Similarly, the fact that the prosecution did not use all of its available peremptory challenges weighs against a finding that a prima facie case has been established. *See State v. Lara,* 110 N.M. 507, 512, 797 P.2d 296, 301 (Ct.App.), *cert. denied,* 110 N.M. 330, 795 P.2d 1022 (1990); *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1522 (6th Cir.1988); *United States v. Montgomery,* 819 F.2d 847, 851 (8th Cir.1987) (fact that government accepted jury including two blacks, when it could have used its remaining peremptory challenges to strike them, shows government did not attempt to exclude all blacks or to exclude as many as it could).

In this appeal, the state used only six of its seventeen challenges, or 35.3 percent, to strike Hispanics, and five of seventeen, or 29.4 percent, to strike Hispanic males. In *Gonzales,* we held that the state's use of eighty percent of its challenges to strike Hispanics was sufficient to establish a prima facie case. *See also Stanley,* 542 A.2d at 1278–799 (prima facie case made where state used eighty percent of peremptory challenges to strike blacks). We are not prepared to hold that the state's use of only 35.3 percent of its strikes to challenge Hispanics rises to the level of a prima facie showing of purposeful discrimination where the facts show that ten out of twelve jury members selected were Hispanic. *Cf. Sandoval,* 105 N.M. at 699, 736 P.2d at 505 (prima facie case established where prosecutor struck only two Hispanic jurors with chance of serving on the jury); *Battle,* 836 F.2d at 1085–86 (prima facie case established where government used five of six peremptories to strike five of seven blacks from panel).

Another relevant factor (in determining whether a prima facie showing has been made) is the racial makeup of the petit jury, as compared to the composition of the venire. "[L]ower courts are disinclined to find a prima facie [*Batson*] case ... where the percentage represented on the petit jury turns out not to be below that on the panel." 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 21.3(d), at 254 (Supp.1991); *see Allison,* 908 F.2d at 1538 (no prima facie case where blacks were 21 percent of jury compared with 15 percent of venire); *Sangineto–Miranda,* 859 F.2d at 1522 (fact that percentage of minorities on ultimate jury is the same or greater than on the panel tends to negate inference of discrimination); *Williams v. State,* 258 Ga. 281, 368 S.E.2d 742, 747 (1988) (blacks constituted one-third of petit jury but only one-fourth of panel; no prima facie case), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3261, 106 L.Ed.2d 606 (1989); *People v. Evans,* 125 Ill.2d 50, 125 Ill.Dec. 790, 796, 530 N.E.2d 1360, 1366 (1988) (no prima facie showing where jury 16.6 percent

black and panel 14.5 percent black), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989).

Here, forty of fifty-four, or 74.1 percent, of the qualified jurors were Hispanic. Approximately twenty-two of the fifty-four, or 40.7 percent, were Hispanic males. Including alternate jurors, eleven of the fourteen jurors, or 78.6 percent, were Hispanic. Six of the fourteen, or 42.9 percent, were Hispanic males.

Defendants contend that the prosecutor could not have eliminated all Hispanics from the jury, and thus, his failure to exercise all available challenges is irrelevant. Nevertheless, the prosecutor could have attempted to minimize the Hispanic presence on the jury by exercising additional challenges. The fact that he did not do so, in our view, tends to negate any inference of purposeful discrimination. *See Lara,* 110 N.M. at 512, 797 P.2d at 301; *Montgomery,* 819 F.2d at 851. Additionally, defendants' argument demonstrates that the state could hardly help striking Hispanic jurors because of the heavily Hispanic composition of the panel.

We note that Dominguez argues an additional circumstance he claims raises an inference of discrimination; namely, the fact that the prosecutor articulated a racially neutral reason for his peremptory challenge of Jake Ortega. Thus, Dominguez reasons that the prosecutor's silence on the other challenges was telling. Dominguez has not stated any authority for this proposition. *See In re Adoption of Doe,* 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984). Besides, we may not consider the prosecutor's explanations for his peremptory challenges in determining whether a prima facie case of discrimination has been made. *Goode,* 107 N.M. at 301–02, 756 P.2d at 581–82.

■ Finally, before leaving this issue, we consider it necessary to clarify a statement made by this Court in *Gonzales.* There, we suggested that facts such as the state's failure to strike all members of the cognizable racial group or its failure to use all of its strikes should only be taken into account in determining whether the state

rebutted a prima facie case. *Gonzales,* 111 N.M. at 597, 808 P.2d at 47; *cf. Lara,* 110 N.M. at 512, 797 P.2d at 301 (fact that prosecutor did not use all of available peremptory challenges considered in determining whether prima facie case made). However, we believe such factors should be weighed in the trial court's determination of whether a prima facie case has been established in the first instance, not in the state's rebuttal stage. *See Sandoval,* 105 N.M. at 698, 736 P.2d at 504; *State v. Moore,* 109 N.M. 119, 125, 782 P.2d 91, 97 (Ct.App.) (court considers *all* relevant circumstances in considering whether required showing made), *cert. denied,* 109 N.M. 54, 781 P.2d 782 (1989). Rebuttal of the prima facie case more appropriately encompasses the state's articulation of racially neutral, specific reasons for the challenges. *Moore,* 109 N.M. at 125–26, 782 P.2d at 97–98. For these reasons, we modify *Gonzales* to the extent that it indicates that such factors should be reserved for rebuttal of the prima facie case.

A defendant desiring to raise a *Batson* issue must "clearly make a prima facie case that shifts the burden of production." *Id.* at 127, 782 P.2d at 99. In this appeal, the state used six peremptory challenges to strike Hispanics, five of them males. The prosecutor did not individually question any of the challenged jurors during voir dire. On the other hand, the state did not use eleven of its available challenges and accepted numerous Hispanic jurors, including men. As a result, the jury that was selected had a higher percentage of Hispanics than the jury venire had. Based on these facts, we conclude that defendants did not meet their burden of establishing a prima facie case. Therefore, the trial court did not err in failing to require the state to explain the reasons for its challenges.

### 2. *Motion to Sever.*

Before trial, defendants unsuccessfully moved to have their trials severed from that of codefendant George Lopez. The state's theory of the case was that defendants aided and abetted Lopez in his infliction of great bodily harm on Paul Mascare-

nas. Defendants contend the joint trial prejudiced them because it allowed the jury to become confused about the culpability of each individual defendant and to convict by improperly imputing to them the acts and intent of others. Ortega points to evidence that he did not participate in the fight, that he had no weapon, and that he did not incite or participate in George Lopez' act. Dominguez relies on testimony that he was not in the vicinity of the fight until a few seconds before it ended and that he did not have a weapon.

■ Joinder of defendants is proper when the offenses "were part of a common scheme or plan," or "were so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the others." SCRA 1986, 5–203(B)(3)(a), (b). Our standard of review applicable to severance issues is exceedingly narrow. *State v. Ramming,* 106 N.M. 42, 47, 738 P.2d 914, 919 (Ct.App.), *cert. denied,* 106 N.M. 7, 738 P.2d 125, *and cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987). The essence of our review is to determine whether the joint trial resulted in an appreciable risk that the jury convicted for illegitimate reasons. *Id.* To succeed in proving error in the denial of a motion to sever, a defendant must show that joinder prejudiced him. *State v. Pacheco,* 110 N.M. 599, 604, 798 P.2d 200, 205 (Ct.App.), *cert. denied,* 110 N.M. 533, 797 P.2d 983 (1990).

■ Defendants here do not argue improper joinder. Instead, they argue that the trial court erred in refusing to grant a severance to permit separate trials. All charges arose from the single, brief incident in which Paul Mascarenas was stabbed to death. We believe there were valid reasons to try defendants and George Lopez together. Defendants were part of a group of persons kicking and hitting Paul Mascarenas while George Lopez was stabbing him. The basis of defendants' culpability was that they aided and abetted Lopez. Thus, the jury necessarily had to consider defendants' actions in relation to the evidence against George Lopez. Also, defendants have not suggested that the evidence that George Lopez stabbed the victim would have been inadmissible against them at a separate trial. *See State v. Benavidez,* 87 N.M. 223, 227, 531 P.2d 957, 961 (Ct.App.1975) (holding trial court abused its discretion by denying severance where evidence would be admitted at joint trial that would be inadmissible against movant at a separate trial; decided under former rule).

Additionally, it is apparent to us that the jury was able to follow the evidence and apply it to each individual count and to each defendant. Although the evidence of the extent of each defendant's involvement was conflicting, the incident itself was brief and uncomplicated. Defendants, together with codefendants Herbert Lopez and George Lopez, were convicted of aggravated battery. However, Victor Cordova was found guilty only of battery, although the jury was instructed on aggravated battery. The jury also acquitted George Lopez of first degree murder, finding him guilty of second degree murder and aggravated battery. These distinct determinations indicate that the jury was able to separate the evidence against each defendant and differentiate among degrees of culpability. We conclude that the trial court correctly refused to sever defendants' trial. *See State v. Shade,* 104 N.M. 710, 725–26, 726 P.2d 864, 879–80 (Ct.App.), *cert. quashed sub nom. Vincent v. State,* 104 N.M. 702, 726 P.2d 856 (1986). We thus hold there was no abuse of discretion on this issue.

3. *Defendants' Requested Instruction.*

Defendants requested the following instruction: "A defendant may not be held guilty as aider and abettor for independent act of another person, even though same victim was assaulted by both, since sharing of criminal intent is absent."

The trial court refused the requested instruction, instead giving SCRA 1986, 14–2822, the uniform instruction on aiding and abetting. Defendants contend their proposed instruction would have clarified the requirement that the jury find that they committed some affirmative act of encour-

agement in order to convict them. Ortega asserts there was no evidence that he was seen with a weapon, that he struck Paul Mascarenas, that he was heard making threats or offering encouragement to the other codefendants, or that there were any wounds found on the victim constituting great bodily harm outside of the fatal stab wounds inflicted by George Lopez. Dominguez specifically contends that the stabbing occurred before he arrived at the scene of the fight.

▬▬▬ A defendant is entitled to a jury instruction on his theory of the case if there is evidence to support it. *State v. Ho'o*, 99 N.M. 140, 145, 654 P.2d 1040, 1045 (Ct.App.), *cert. denied*, 99 N.M. 148, 655 P.2d 160 (1982). Trial courts should be liberal in instructing the jury with particularity on defenses supported by the evidence. *Poore v. State*, 94 N.M. 172, 174, 608 P.2d 148, 150 (1980); *see also State v. Privett*, 104 N.M. 79, 82, 717 P.2d 55, 58 (1986). In *Poore*, our Supreme Court reversed the defendant's conviction because the trial court had refused his requested instruction that specifically set out his theory of the case. In reversing, the Court noted that the trial court's instructions set out Poore's theory of defense "obliquely by inference." *Poore*, 94 N.M. at 174, 608 P.2d at 150.

▬▬▬ We believe the facts of this appeal are distinguishable from those of *Poore*. First, we take issue with Ortega's characterization of the evidence of his participation in the attack against Paul Mascarenas. Eric Mascarenas testified that Ortega was among the several men "kicking and hitting" Paul. Alex Martinez stated that Ortega was among the first to rush the victim. George Lopez was in the group that attacked Paul. Also, as we discuss below in our discussion of the sufficiency of the evidence, the timing of the stabbing was not determinative of Dominguez' culpability as an aider and abettor.

The jury was instructed that, to convict defendants, it had to find that they "helped, encouraged or caused the crime to be committed." It also was instructed that defendants had to have intended that the

crime be committed. Defendants must have shared the principal's intent to be convicted as aiders and abettors. *State v. Luna*, 92 N.M. 680, 683, 594 P.2d 340, 343 (Ct.App.1979). Their mere presence at the scene was insufficient. *State v. Salazar*, 78 N.M. 329, 331, 431 P.2d 62, 64 (1967). The intent required for aggravated battery is the intent to injure. NMSA 1978, § 30–3–5(A) (Repl.Pamp.1984); *State v. Valles*, 84 N.M. 1, 498 P.2d 693 (Ct.App.1972). It was not necessary that defendants intended or foresaw the results of George Lopez' acts. *See State v. Holden*, 85 N.M. 397, 400, 512 P.2d 970, 973 (Ct.App.), *cert. denied*, 85 N.M. 380, 512 P.2d 953 (1973). The evidence in this case demonstrated that defendants and George Lopez did not act independently of each other, even if defendants did not intend or foresee the stabbing. In this regard, defendants' requested instruction was potentially misleading since it suggested they could not be convicted if they did not intend or foresee the end result.

Unlike the situation in *Poore*, the instruction in this appeal clearly expressed what the jury was required to find in order to convict defendants. We agree with the state's argument that if "defendant[s] 'intended that the crime be committed' and 'helped, encouraged or caused' the crime, the principal can hardly be said to have acted independently." Requested instructions are properly refused if the subject matter is adequately covered by other instructions. *State v. Sparks*, 102 N.M. 317, 324, 694 P.2d 1382, 1389 (Ct.App.1985). It is also generally not error to refuse an instruction that instructs the jury what cannot be the basis of its verdict. *See State v. Brown*, 93 N.M. 236, 238, 599 P.2d 389, 392 (Ct.App.), *cert. quashed*, 93 N.M. 172, 598 P.2d 215 (1979), *cert. denied*, 444 U.S. 1084, 100 S.Ct. 1041, 62 L.Ed.2d 769 (1980). Here, the uniform jury instruction fully informed the jury of the elements of the offense of aiding and abetting. An approved jury instruction must be used without substantial modification or substitution, except where it is shown to be insufficient. *See* SCRA 1986, Uniform Jury In-

structions—Criminal, General Use Note. We conclude that the trial court did not err in refusing the requested instruction.

DOMINGUEZ' ISSUES

1. *Sufficiency of the Evidence.*

 Dominguez contends the trial court erred in denying his motion for a directed verdict. The question presented by a directed verdict motion is whether there was substantial evidence to support the charge. *State v. Maestas,* 92 N.M. 135, 145, 584 P.2d 182, 192 (Ct.App.1978). Substantial evidence is evidence that is acceptable to a reasonable mind as adequate support for a conclusion. *Sparks,* 102 N.M. at 320, 694 P.2d at 1385. Evidence supporting a conviction may be direct or circumstantial. *State v. Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). We view the evidence in the light most favorable to the state, resolving all conflicts in the evidence and indulging all permissible inferences to be drawn from it in favor of the verdict. *Id.* We do not weigh the evidence, and may not substitute our judgment for that of the jury so long as there is sufficient evidence to support the verdict. *Id.*

 Our task then is to determine whether sufficient evidence existed to support the jury's verdict that Dominguez aided and abetted the aggravated battery against Paul Mascarenas. In *State v. Ochoa,* 41 N.M. 589, 599, 72 P.2d 609, 615 (1937), our Supreme Court stated:

The evidence of aiding and abetting may be as broad and varied as are the means of communicating thought from one individual to another; by acts, conduct, words, signs, or by any means sufficient to incite, encourage or instigate commission of the offense or calculated to make known that commission of an offense already undertaken has the aider's support or approval.

Mere presence, or even presence with mental approbation, is insufficient to sustain a conviction as an aider or abettor. *Luna,* 92 N.M. at 683, 594 P.2d at 343. "Presence must be accompanied by some outward manifestation or expression of approval." *Id.*

Dominguez' theory is that the stabbing took place before he arrived at the place where Paul Mascarenas was being beaten. To support this argument, he focuses on evidence that he remained at the scene of the fight with Eric Mascarenas until the fight's conclusion and that he could only have been in the vicinity of the victim for a few seconds. Dominguez maintains that he could not have helped, encouraged or caused the aggravated battery to occur because the crime was committed before he arrived at the scene of the fight involving Paul. He also claims that the evidence shows he could not have intended the aggravated battery to occur.

We deem it unnecessary to decide whether the jury could have reasonably inferred that Dominguez was present at the aggravated battery scene before the stabbing. *But see State v. O'Dell,* 85 N.M. 536, 537, 514 P.2d 55, 56 (Ct.App.1973) (notwithstanding defendant's claim that he did not know of the robbery until after its commission, he could be convicted as accessory where he shot at pursuing police car; such evidence demonstrated defendant approved the robbery and shared robber's intent). As we noted previously (on the instruction issue), the intent required for aggravated battery is the intent to injure. § 30–3–5(A). Thus, although Dominguez was required to have shared the principal's intent, *see Luna,* 92 N.M. at 683, 594 P.2d at 343, he did not have to intend or foresee the end result (in this case, the stabbing). *See Holden,* 85 N.M. at 400, 512 P.2d at 973.

We hold that there was substantial evidence that Dominguez shared Lopez' intent. Before the fight, Dominguez was yelling in Spanish in an angry manner that sounded like cursing. After the fight with Eric ended, Dominguez rushed over to the scene of the fight with Paul and joined in that attack. Finally, after the fight, Dominguez and three others drove past the victim's stopped car. Dominguez said: "That's what they get." Dominguez displayed his approval of the crime before, during, and after the fight.

Additionally, felony aggravated battery occurs when the defendant acts "in any

manner whereby great bodily harm or death can be inflicted." § 30–3–5(C); *see also* SCRA 1986, 14–323. The jury was so instructed in this case. Dominguez was one of several men kicking and hitting the victim. One of the men had a tire tool. This evidence establishes that Dominguez acted in a way that would *likely* result in great bodily harm or even death to the victim, despite the lack of evidence of such harm.

### 2. *Motion to Dismiss Indictment.*

 Dominguez moved to dismiss the indictment based on his inability to testify before the grand jury. At the hearing on the motion, he testified concerning his efforts to appear before the grand jury. Dominguez argues that, because he was incarcerated at the time, the state bore responsibility to assure his attendance at the grand jury. In response, the state argues that Dominguez: (1) did not show that he took sufficient steps to testify at the grand jury; and (2) did not show prejudice. We agree with the state's second point and therefore need not address the first.

A defendant must suffer "actual and substantial prejudice" before a trial court is required to dismiss an indictment for failure to receive a target notice because of the state's lack of diligence. NMSA 1978, § 31–6–11(B) (Repl.Pamp.1984); *see also State v. Penner*, 100 N.M. 377, 378, 671 P.2d 38, 39 (Ct.App.1983). The defendant must demonstrate that his missing testimony would have changed the vote of the grand jury on the issue of probable cause. *Penner*, 100 N.M. at 379, 671 P.2d at 40. We see no reason not to apply this standard where the defendant does not testify before the grand jury for other reasons, such as occurred in this appeal. *See generally Buzbee v. Donnelly*, 96 N.M. 692, 706, 634 P.2d 1244, 1258 (1981) (rejecting per se approach to dismissal of indictment).

Dominguez has not established how his missing testimony would have changed the vote of the grand jury. We therefore conclude that the trial court did not err in denying his motion to dismiss the indictment.

### ORTEGA'S ISSUE—LEGALITY OF SENTENCE

Ortega was sentenced to three years imprisonment, all of which was suspended. At sentencing, the trial court gave Ortega the choice of paying a $5,000 fine or making a $500 donation to the Taos County Sheriff's Office. Ortega chose the $500 donation. The trial court ordered, as a specific term of probation, that Ortega make the donation within six months.

Ortega contends that the condition of probation requiring him to donate money to a local police agency was illegal. *See* N.M. Const. art. VI, § 30 (Repl.Pamp.1992) (all fees collected by judicial department to be paid into state treasury). The state argues that: (1) the probation condition was lawful because it was reasonably related to Ortega's rehabilitation, *see* NMSA 1978, § 31–20–6 (Repl.Pamp.1990); and (2) the condition did not violate the state constitution because the donation did not constitute a fee collected by the judicial department.

 A claim that a sentence is unauthorized can be raised for the first time on appeal. *Sparks*, 102 N.M. at 325, 694 P.2d at 1390. The trial court's authority to sentence is only that which has been provided by statute. *Id.* at 324, 694 P.2d at 1389. Conditions of probation that are not authorized by law are void. *State v. Ayala*, 95 N.M. 464, 465, 623 P.2d 584, 585 (Ct.App. 1981). The trial court may not impose an unauthorized sentence, even where the defendant agrees to it. *State v. Crespin*, 96 N.M. 640, 642–43, 633 P.2d 1238, 1240–41 (Ct.App.1981) (even if defendant waived double jeopardy protection and agreed to increased length of probation and to increased penalty through changed conditions of probation, trial court could not so order in absence of statutory authority); *see also State v. Chavez*, 100 N.M. 750, 751, 676 P.2d 827, 828 (Ct.App.1984); *but see State v. Padilla*, 98 N.M. 349, 354, 648 P.2d 807, 812 (Ct.App.) (parties could agree to probation costs exceeding those authorized by statute), *cert. denied*, 98 N.M. 336, 648 P.2d 794 (1982).

■ The state concedes that charitable contributions unauthorized by statute have not been upheld. *See United States v. Wright Contracting Co.,* 728 F.2d 648 (4th Cir.1984). At least one court has also struck down a condition of a sentence involving possible reduction of a fine in return for the defendant's contribution to an authorized charity. *See United States v. Haile,* 795 F.2d 489, 491 (5th Cir.1986). Section 31–20–6 does not authorize trial courts to order charitable contributions to law enforcement agencies other than local crime stopper programs. § 31–20–6(E). We also cannot agree that the condition was reasonably related to Ortega's rehabilitation since the Sheriff's Office was unaggrieved by Ortega's actions. *Cf.* NMSA 1978, § 31–17–1 (Repl.Pamp.1990) (restitution to be made to victims of defendant's criminal activities). We conclude that the trial court's condition of probation requiring Ortega to contribute $500 to the Taos County Sheriff's Office was unauthorized. Thus, we need not reach Ortega's constitutional argument.

■ Citing *Padilla,* the state argues that Ortega waived his right to complain about the sentence by agreeing to it below. We think the state's reliance on *Padilla* is misplaced. In *Padilla,* the defendant's attorney actively suggested the unauthorized probation costs in lieu of incarceration. Further, the trial court in *Padilla* simply ordered probation costs in excess of those permitted by statute. It did not extend the length of the defendant's probation or order that probation costs be paid to an unauthorized entity. *See Chavez,* 100 N.M. at 751, 676 P.2d at 828; *Crespin,* 96 N.M. at 642–43, 633 P.2d at 1240–41. Finally, we do not concur in the state's characterization of Ortega's choice as an "agreement." Ortega's choice was between an illegal yet small "donation" and a legal fine ten times greater than the donation, truly a "Hobson's choice." *See generally State v. Whitaker,* 110 N.M. 486, 491–94, 797 P.2d 275, 280–83 (Ct.App.1990) (defendant given choice between restitution of large sum of money and prison term without inquiry into ability to pay). We conclude that these circumstances resulted in the nonexistence of a "choice" that was available to Ortega.

■ The probation condition requiring Ortega to contribute $500 to the Taos County Sheriff's Department was unauthorized and therefore void. At the same time, we agree with the state that the trial court clearly believed that a monetary penalty was necessary for Ortega's rehabilitation and intended Ortega to pay some sort of fine. Under these conditions, we believe it would be unfair to simply strike the probation condition. *Cf. State v. Gibson,* 96 N.M. 742, 743, 634 P.2d 1294, 1295 (Ct. App.) (plea agreement stands or falls as a unit; defendant may not be relieved of part of plea bargain without giving up benefits he received in the bargain), *cert. denied,* 97 N.M. 140, 637 P.2d 571 (1981).

However, we disagree with the state that, on remand for imposition of a valid sentence, the trial court should have discretion to impose a fine of $5,000. Although an invalid sentence may be corrected even if the valid sentence is more onerous, *see State v. Dennis F.,* 104 N.M. 619, 622, 725 P.2d 595, 598 (Ct.App.1986), a valid sentence may not be subsequently increased. *See Williams v. State,* 81 N.M. 605, 471 P.2d 175 (1970). The state apparently believes that the "donation" and the "fine" were different; we disagree. A "fine" is a sum of money that a court orders to be paid as punishment for a crime. *See Black's Law Dictionary* 524 (West 5th ed., abridged 1983). A "donation" is a voluntary payment. *See Webster's Third New International Dictionary* 672 (Philip Babcock Gove et al. eds., unabridged ed.1976). We believe that both options offered to Ortega were essentially fines, albeit of differing amounts and with payment intended to go to different entities, because the court was ordering payment as punishment for a crime. The amount ordered was within the proper range for a fine, *see* NMSA 1978, § 31–18–15(D)(3) (Repl.Pamp.1990) (authorizing court to impose up to $5,000 fine for fourth degree felony), and therefore the order was valid except for the portion directing that payment be made to the Taos County Sheriff's

**458**

Office, which is not among the entities statutorily authorized to receive payment. On remand, therefore, we order the trial court to reconsider imposition of a fine not to exceed $500. *Cf. Williams*, 81 N.M. at 607–08, 471 P.2d at 177–78 (where defendant had been orally sentenced to a maximum of 35 years and sentence revised later to maximum of life, fairness required that 35 years be restored as the maximum).

CONCLUSION

We affirm defendants' convictions. We vacate the portion of Ortega's sentence requiring a donation to the Taos County Sheriff's Office. This matter is remanded to the trial court for further sentencing proceedings consistent with this opinion, and the entry of an amended judgment and sentence.

**IT IS SO ORDERED.**

DONNELLY and CHAVEZ, JJ., concur.