**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 29, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOSEPH RUIZ,

Defendant - Appellant.

No. 08-2252

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D. Ct. No. 1:07-CR-01769-WJ-1)**

---

Todd Hotchkiss, Frechette & Associates, P.C., Albuquerque, New Mexico, appearing for Appellant.

Laura Fashing, Assistant United States Attorney (Gregory J. Fouratt, United States Attorney, with her on the brief), Office of the United States Attorney for the District of New Mexico, appearing for Appellee.

---

Before **TACHA**, **McKAY**, and **LUCERO**, Circuit Judges.

---

**TACHA**, Circuit Judge.

---

Defendant-appellant Joseph Ruiz was convicted of multiple counts of honest services mail and wire fraud, corrupt solicitation, and extortion in violation of 18 U.S.C. §§ 1341, 1343, 1346, 666, and 1951, and aiding and

abetting on each count in violation of 18 U.S.C. § 2. Mr. Ruiz's convictions stem from his diversion of state funds to two charities with which he and his superior were closely affiliated while serving as a New Mexico deputy insurance superintendent.[1] On appeal, Mr. Ruiz claims the government presented insufficient evidence that: (1) he was engaged in a scheme to defraud; (2) he acted with specific fraudulent intent; (3) he deprived the citizens of New Mexico of his honest services; (4) he corruptly solicited something of value; and (5) he wrongfully obtained property from another. Mr. Ruiz bases each of these specific claims on the same fundamental argument: that his solicitation of charitable contributions in lieu of fines was authorized by New Mexico law; therefore, that conduct may not form the basis of his federal convictions. Additionally, Mr. Ruiz argues that we must reverse his mail fraud convictions because there was no evidence that he caused the use of the mail to further a fraudulent scheme. We have jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

In 2001, Eric Serna became the superintendent of New Mexico's insurance division. Shortly after assuming that position, Mr. Serna hired Mr. Ruiz as a deputy superintendent. New Mexico's insurance division is primarily responsible

---

[1]One charge against Mr. Ruiz did not involve a solicitation of charitable donations. That charge alleged that Mr. Ruiz threatened substantial penalties against an insurer for minor violations of the state's insurance code in order to force the company to settle a claim filed by a prominent New Mexico State Senator for a much higher amount than the claim was actually worth.

for enforcing the state's insurance code which requires, among other things, that insurance adjusters doing business in the state be licensed by the state. New Mexico is one of a minority of states that has such a licensing requirement, and prior to Mr. Ruiz's tenure as a deputy insurance superintendent the insurance division rarely assessed fines against companies who employed unlicensed adjusters. Mr. Ruiz, however, revived the licensing requirement and perpetrated a quid pro quo scheme through his enforcement of it.

Mr. Ruiz's scheme was simple. First, he would detect licensing violations by various insurers and threaten them with the maximum possible fines. Then, he would inform the insurers that they could avoid paying the fines if they contributed ten to twenty percent of the fine amount to two specific charities with which he and Mr. Serna were connected, the Con Alma Health Foundation ("Con Alma") and the Southwestern Arts Institute ("SAI").

Generally, insurers that agreed to contribute to one or both of the charities were not fined and were placed in good standing with the insurance department, and no record of their violations was ever made. On the other hand, if insurers rejected the charitable-contribution option they ultimately paid a lower fine than that with which they were originally threatened, but the fine amounts were greater than the charitable contribution Mr. Ruiz sought. Furthermore, these non-cooperating insurers' licensing violations were made public and forwarded to the National Association of Insurance Commissioners. In one case, an insurer agreed

to make a charitable contribution in lieu of paying a fine, but when it suggested that it would like to contribute to a charity other than Con Alma or SAI, Mr. Ruiz changed course and demanded that it pay the fine.

Mr. Serna and Mr. Ruiz were closely connected to Con Alma and SAI, respectively. Mr. Serna was the president of Con Alma, which was a non-profit organization that subsidized health benefits for indigent New Mexico citizens. SAI was an organization that had been inactive for years but was revitalized when Sunstone Press, the publisher of children's books authored by Mr. Ruiz, arranged to solicit donations to SAI that would be used to purchase Mr. Ruiz's books for underprivileged New Mexico school children. The government demonstrated that Mr. Ruiz successfully solicited more than $150,000 for the two charities and personally received over $1500 in royalties from books purchased with funds "donated" by insurance companies during the course of the scheme. The government also demonstrated that Mr. Ruiz was informed, on at least three occasions, that the insurance division was not authorized to solicit any type of charitable contribution in lieu of a fine.

## II. DISCUSSION

A. <u>Mr. Ruiz's Solicitation of Charitable Contributions in Lieu of Fines Violated New Mexico Law</u>

All but one of Mr. Ruiz's claims on appeal are based on his primary contention that the New Mexico insurance code authorized his solicitation of

charitable contributions in lieu of fines.  Implicitly, Mr. Ruiz claims he cannot be convicted under federal criminal statutes for conduct that was authorized by state law.  We recognize that the courts of appeals currently disagree whether the federal honest services fraud statute, under which Mr. Ruiz was convicted, requires a predicate state law violation, and we are mindful that the Supreme Court will soon resolve this conflict.  *See United States v. Brumley*, 116 F.3d 728, 734 (5th Cir. 1997) (adopting a state-law limiting principle to the federal honest services fraud statute under which "a federal prosecutor must prove that conduct of a state official breached a duty respecting the provision of services owed . . . under state law"); *United States v. Murphy*, 323 F.3d 102, 116 (3d Cir. 2003) (stating "[w]e thus endorse . . . the decisions of other Courts of Appeals that have . . . required a state law limiting principle for honest services fraud").  *But see United States v. Weyhrauch*, 548 F.3d 1237, 1244 (9th Cir. 2008) (stating "[t]he majority of circuits . . . have held that the meaning of 'honest services' is governed by a uniform federal standard inherent in [the statute], although they have not uniformly defined the contours of that standard"), *cert granted*, 129 S. Ct. 2863 (2009).  This case does not require us to address this precise issue, however, because even if a predicate state law violation is required for a federal honest services fraud conviction, Mr. Ruiz's conduct clearly violated New Mexico

law.[2]

"[S]tate courts are the final arbiters of state law." *United States v. DeGasso*, 369 F.3d 1139, 1145 (10th Cir. 2004). When the highest court in a state has not interpreted a particular state statutory provision, however, a federal court must examine state appellate court opinions and other authorities to "predict how the [highest] court would interpret [that particular provision]." *Id.* In doing so, a federal court must follow state rules of statutory construction. *Id.* at 1145–46. In New Mexico, "words of a statute . . . [are] given their ordinary meaning" unless such a construction would "render the statute's application absurd, unreasonable, or unjust." *State v. Rowell*, 908 P.2d 1379, 1382 (N.M. 1995).

The New Mexico insurance code requires that all adjusters operating within the state obtain a license, but the code does not provide a specific statutory penalty for operating without a license. *See* N.M. Stat. Ann. § 59A-11-1. Section 59A-1-18, however, provides, "[w]here other monetary penalty is not expressly provided for, an administrative penalty may be assessed for violations of the Insurance Code." *Id.* § 59A-1-18(B). That section further requires that "[e]very administrative penalty shall be imposed by written order of the superintendent

---

[2]Mr. Ruiz also challenges his corrupt solicitation and extortion convictions on the same state-law theory. Because we reject this state-law argument, we also will not address whether a predicate state-law violation is required by either of these two statutes.

made after [a] hearing." *Id.* Presumably to ensure transparency and a smooth transition of administrations, the insurance code also specifically imposes a duty upon the superintendent to maintain all records relating to the business of the department and to make those records open to public inspection. *Id.* § 59A-2-12. Finally, and particularly important to the resolution of this case, the insurance code requires that "[a]ll money received by the [insurance] division for fees, licenses, penalties and taxes shall be paid daily by the superintendent to the state treasurer." *Id.* § 59A-6-5(A).

Mr. Ruiz claims the insurance superintendent has unfettered authority to impose fines, settle claims, or forgive violations under § 59A-1-18. Mr. Ruiz argues that Mr. Serna, pursuant to this broad authority, directed him to forgive licensing violations if companies made voluntary donations directly to Con Alma or SAI. Finally, and most important, Mr. Ruiz claims these charitable donations were not fines or penalties under § 59A-6-5 because they were never actually received by the insurance division. Therefore, in Mr. Ruiz's view, the charitable contributions were not required to be paid to the state treasurer and no documentation of them was required to be created or kept by the insurance division.

Mr. Ruiz's literal interpretation of § 59A-6-5, which focuses on the phrase "received by the insurance department," is untenable and would produce absurd results. Indeed, under his construction, the superintendent could seemingly

-7-

negotiate deals with insurers that would allow them to avoid monetary penalties if they would deposit money into the superintendent's spouse's bank account, and because that money would not actually be received by the insurance department, it would not have to be paid to the state treasurer. Such a system in which regulated entities could legally avoid monetary penalties owed to the state by paying off regulators cannot be what the New Mexico Legislature intended when it drafted § 59A-6-5.

Furthermore, although no New Mexico court has interpreted § 59A-6-5, the New Mexico Court of Appeals has held that a district court may not order a defendant to contribute money to a sheriff's department fund in lieu of paying a fine. *State v. Dominguez*, 853 P.2d 147, 158–59 (N.M. Ct. App. 1993). In *Dominguez*, the New Mexico Court of Appeals recognized that as an alternative to paying fines or penalties owed to the state, "charitable contributions unauthorized by statute have not been upheld." *Id*. at 159.

Accordingly, the absurd results that Mr. Ruiz's proffered construction of the insurance code would produce and the New Mexico Court of Appeals' statement generally disfavoring charitable contributions that are not specifically authorized by statute support our conclusion that Mr. Ruiz's conduct was not authorized by New Mexico law. Furthermore, because all but one of Mr. Ruiz's insufficiency of the evidence claims depend on his flawed interpretation of New Mexico law, we reject each of those claims.

B.    There Was Sufficient Evidence that Mr. Ruiz Caused the Use of the Mail to Further His Fraudulent Scheme

Mail fraud requires the use of the mail to execute a fraudulent scheme or artifice.  18 U.S.C. § 1341; *see also United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003).  To establish this necessary element of federal mail fraud, the government must prove that the defendant "'set forces in motion which . . . would involve mail uses.'"  *United States v. Worley*, 751 F.2d 348, 350 (10th Cir. 1984) (quoting *Marvin v. United States*, 279 F.2d 451 (10th Cir. 1960)).  In other words, "[t]he only causation required by the mail fraud statute is whether the defendant could reasonably foresee the occurrence of mailings."  *Id*.

Mr. Ruiz's two mail fraud convictions are based on his requests that two insurance companies make contributions directly to Con Alma or SAI, and those companies' subsequent uses of the mail to deliver their contribution checks.  Mr. Ruiz claims that he did not cause the use of the mail because he had no meaningful control over these companies' method of delivering their contribution checks.  This argument places a much higher burden on the government to prove causation than our case law has previously imposed.  The evidence that Mr. Ruiz directed two insurance companies to make charitable donations directly to the charities, alone, establishes that he set forces in motion, the reasonably foreseeable result of which would be the use of the mail to further his fraudulent scheme.  Accordingly, we conclude that there was sufficient evidence to support

this necessary element of Mr. Ruiz's mail fraud conviction.

### III. CONCLUSION

All but one of Mr. Ruiz's claims on appeal are based on a flawed and unreasonable interpretation of New Mexico law. Contrary to Mr. Ruiz's claims, the New Mexico insurance code does not permit a deputy insurance superintendent to solicit donations to charities in which he and his superior have personal interests instead of collecting fines for the state. Furthermore, there was ample evidence that Mr. Ruiz caused the use of the mail to further his fraudulent scheme. Accordingly, we AFFIRM his convictions.