889 P.2d 225

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Margaret GUZMAN, Defendant–
Appellant.**

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Linda GUTIERREZ, Defendant–
Appellant.**

**Nos. 14802, 14803.**

Court of Appeals of New Mexico.

Nov. 17, 1994.

Certiorari Denied Jan. 5, 1995.

Tom Udall, Atty. Gen., Daniel F. Haft, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Sammy J. Quintana, Chief Public Defender, Sue A. Herrmann, Asst. Appellate Defender, Santa Fe, for defendant-appellant Margaret Guzman.

Lauren Baldwin, Albuquerque, for defendant-appellant Linda Gutierrez.

*OPINION*

BLACK, J.

The previous opinion is withdrawn and the following is substituted in its place.

Defendants Margaret Guzman and Linda Gutierrez were convicted of possession of marijuana with intent to distribute, *see* NMSA 1978, § 30-31-22(A) (Cum.Supp. 1994), conspiracy to commit distribution of marijuana, *see* NMSA 1978, § 30-28-2 (Repl. Pamp.1994), and possession of drug paraphernalia, *see* NMSA 1978, § 30-31-25.1(A) (Repl.Pamp.1989). On appeal, Defendants argue that: (1) the State's use of all of its peremptory challenges against Hispanic prospective jurors established a prima facie case of discrimination and the district court erred in accepting the State's racially neutral explanations; (2) there was insufficient evidence to support the convictions; (3) Guzman's right to confront witnesses against her was violated by the admission of hearsay statements by Gutierrez; and (4) the closing argument of the prosecutor referring to Defendants' receipt of welfare denied Defendants a fair trial. We reverse and remand on the first issue, which is the only one which merits publication. We consider the other issues in a memorandum opinion only as they may arise on remand.

## I. BACKGROUND

Detective Brian Sallee of the Albuquerque Police Department testified that he executed a search warrant for the residence in question on March 25, 1992. In the southeast bedroom, Detective Sallee found and seized a "water bong," a device used to smoke marijuana. In the southwest bedroom, Detective Sallee found and seized four sandwich bags containing a total of .55 ounces of marijuana and a letter addressed to Guzman. In a third bedroom, Detective Sallee found and seized a scale, four sandwich bags containing 1.9 ounces of marijuana, and a pipe used to smoke marijuana.

Detective Donavon Roberts testified that he was present for the search and handled the paperwork. He stated that he found a bag of marijuana, weighing .05 ounces, sitting on top of a box in a kitchen cabinet. He also stated that he seized marijuana found on the kitchen counter.

Officer Cindy Sallee testified that she was called to search Guzman and that she found three baggies of marijuana in Guzman's bra, one packaged by itself and two in a sandwich bag. The total weight of this marijuana was 1.5 ounces.

Detective Jim Zamora testified that he surveilled the residence before the search. He testified that he watched for approximately two hours because he wanted to make sure someone was there when police executed the warrant. He also stated that two to four times people drove up to the apartment, went in for three to four minutes, and came out.

Following voir dire, the prosecutor used all five of his peremptory challenges against Hispanic prospective jurors. Counsel for Gutierrez objected, noting: "The State has exerted five strikes. So far, each and every one has been a Hispanic venireman." Although the district court did not rule that counsel for Gutierrez had made a prima facie showing of discriminatory intent, the prosecutor immediately advanced a "racially neutral" explanation for each strike.

After counsel for Gutierrez used his last peremptory challenge, the prosecution also raised an objection to the Defendants' use of

peremptory challenges, noting that six out of the seven strikes used by the two Defendants were against individuals with "Anglo surnames." Defense counsel responded that Anglos are not a recognized class, Anglos remained on the jury, and the prosecutor had failed to make a record on ethnicity. The court noted, however, that while there was not a specific record on ethnicity, the jurors struck by the defense were "not Hispanic."

## II. *PEREMPTORY CHALLENGES*

Defendants argue that the State's use of five out of five peremptory challenges against Hispanic prospective jurors was racially motivated and violated Defendants' constitutional rights. In response, the State argues that Defendants failed to establish a prima facie case that the State purposefully discriminated against Hispanic prospective jurors, and, even if Defendants had established a prima facie case of purposeful discrimination, the prosecutor satisfied his burden of providing race-neutral explanations for his peremptory challenges.

■ A review of United States Supreme Court cases establishing the constitutional parameters of the limitations on peremptory challenges indicates the prohibition is grounded not only in a defendant's right to a fair cross-section of jurors but also in the principle that all citizens have the right to participate in jury service. The Supreme Court first dealt with this issue more than a century ago in *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879). In that case, the Supreme Court held a state statute which denied "colored people" the right to act as jurors violated the equal protection provision of the Fourteenth Amendment to the United States Constitution. *Id.* at 307–08.

Ninety years later, the Supreme Court again emphasized the importance of the right of prospective jurors not to be excluded from service on the basis of race in *Carter v. Jury Commission*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970). In that case, black citizens of Greene County, Alabama, filed suit alleging they were qualified and willing to serve as jurors but had never been summoned. In holding that the petitioners had

standing to bring the claim, the Supreme Court made it clear that it was not only the criminal defendants' constitutional rights that must be protected: "Defendants in criminal proceedings do not have the only cognizable legal interest in nondiscriminatory jury selection. People excluded from juries because of their race are as much aggrieved as those indicted and tried by juries chosen under a system of racial exclusion." *Id.* at 329, 90 S.Ct. at 523.

In 1986, the Supreme Court decided *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson* the Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits a state from using peremptory challenges to eliminate prospective jurors on the basis of race. Once again, the Supreme Court noted this prohibition protected both defendants and prospective jurors:

Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try. Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial. A person's race simply "is unrelated to his fitness as a juror." As long ago as *Strauder*, therefore, the Court recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror.

*Id.* at 87, 106 S.Ct. at 1718 (citations omitted).

In *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Supreme Court recognized that parties to the litigation were often the logical ones to protect the rights of prospective jurors to be free from unseen discrimination. Speaking for the Court, Justice Kennedy stated the nature of the right: "An individual juror does not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race." *Id.* at 409, 111 S.Ct. at 1370. Justice Kennedy then noted that the result of active discrimination in jury selection "condones violations

of the United States Constitution within the very institution entrusted with its enforcement, and so invites cynicism respecting the jury's neutrality and its obligation to adhere to the law." *Id.* at 412, 111 S.Ct. at 1371. Finally, he explained the nexus between a defendant's right to an impartial jury and the right of prospective jurors not to be subjected to unconstitutional discrimination:

> Both the excluded juror and the criminal defendant have a common interest in eliminating racial discrimination from the courtroom. A venireperson excluded from jury service because of race suffers a profound personal humiliation heightened by its public character. The rejected juror may lose confidence in the court and its verdicts, as may the defendant if his or her objections cannot be heard. This congruence of interests makes it necessary and appropriate for the defendant to raise the rights of the juror. And, there can be no doubt that petitioner will be a motivated, effective advocate for the excluded venirepersons' rights. Petitioner has much at stake in proving that his jury was improperly constituted due to an equal protection violation, for we have recognized that discrimination in the jury selection process may lead to the reversal of a conviction.

*Id.* at 413–14, 111 S.Ct. at 1372.

The following year the Supreme Court again considered the significance of the Fourteenth Amendment's equal protection mandate on the jury selection process. In *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Supreme Court held that a criminal defendant's use of peremptory challenges was "state action" for equal protection clause purposes and therefore a defendant could not purposefully discriminate in the exercise of such challenges. *Id.* at 49–57, 112 S.Ct. at 2354–57. In so holding, the Supreme Court recognized the logical converse of *Powers,* i.e., that the state also had standing to protect the rights of prospective jurors to equal protection of the law. *Id.* at 57, 112 S.Ct. at 2357. Finally, the Court rejected the argument that defendant's right to a fair trial would be compromised by any limitation on the use of peremptory challenges. "It is an affront to jus-

tice to argue that a fair trial includes the right to discriminate against a group of citizens based upon their race." *Id.* at 57, 112 S.Ct. at 2358.

The United States Supreme Court has made it clear that each prospective juror has the right not to be discriminated against. Various states, including New Mexico, have also recognized that the *Batson* rationale not only protects a defendant's right to an impartial jury, but also protects prospective jurors from discriminatory exclusion. *See, e.g., State v. Gonzales*, 111 N.M. 590, 595, 808 P.2d 40, 45 (Ct.App.), *cert. denied*, 111 N.M. 416, 806 P.2d 65 (1991); *State v. Parker*, 836 S.W.2d 930, 933 (Mo.) (en banc), *cert. denied*, — U.S. —, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992); *People v. Jenkins*, 75 N.Y.2d 550, 555 N.Y.S.2d 10, 554 N.E.2d 47, 51 (1990). *See also* Albert W. Alschuler, *The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts*, 56 U.Chi.L.Rev. 153, 193 (1989).

■ The record indicates that the district court may have operated under a misapprehension that the prohibition against using peremptory challenges to discriminate against prospective jurors on racial or ethnic grounds is based exclusively on a defendant's right to have a representative cross-section of the community on the jury. In rejecting Defendants' challenge, for example, the district court made several observations relevant to our determination of this issue. Initially, the district court ruled: "I don't find any con[c]erted plan to restrict the make up of the jury. I find that the stated reasons are sufficient, *particularly in view of the preponderance of accepted Hispanic surnamed jurors.*" (Emphasis added.) After further argument by counsel, the court observed:

> The jury process is to obtain a fair jury and *Batson* dealt with that issue of fairness and ruled that there was a very limited number of one category of juror and that was all eliminated, but that's not true here. *They are not all eliminated, quite the contrary. A majority is retained.*

(Emphasis added.)

The district court appears to have focused primarily on whether the actual jury fairly

reflected the ethnicity of the venire. The district court specifically found "the stated reasons are sufficient, particularly in view of the preponderance of accepted Hispanic sur-named jurors." While this is relevant to the immediate concerns of Defendants as to whether they had a jury representative of a cross-section of the community, it does not address the right of the stricken prospective jurors to equal protection of the law. Indeed, it is the stigma attached to the disqual-ification of a juror because he or she appears to be of a particular racial or ethnic group that the Supreme Court has has attempted to prevent since *Strauder.*

■ In its motion for rehearing the State, for the first time, argued that *State v. Neely,* 112 N.M. 702, 713, 819 P.2d 249, 260 (1991), "expressly held that '[a]n analysis of hispanic surnames, without more, is not an adequate indicator of whether an individual is of his-panic descent.'" However, in *Neely,* our Supreme Court was dealing with the defen-dant's challenge to the jury venire because it was not compiled from driver's license rec-ords and therefore "her right to a jury com-prised of a fair cross[-]section of the commu-nity was denied." *Id.* Once again, then, the State confuses Defendants' right to a jury drawn from a representative cross-section of the community and the right of prospective jurors not to be rejected on the basis of ethnicity, real or perceived. In any event, when defense counsel identified the chal-lenged jurors as Hispanic based on their surnames, the prosecutor did not contest that identification. Even granting the State's contention that Defendants have the burden of establishing the ethnicity of stricken ju-rors when making a *Batson* claim, identifica-tion by surname is sufficiently reliable to satisfy that burden in the absence of any objection by opposing counsel.

■ Each of the prospective jurors strick-en by the State had a Hispanic surname. Hispanics are a cognizable group for pur-poses of *Batson* inquiry. *See United States v. Rudas,* 905 F.2d 38, 41 (2d Cir.1990); *see also People v. Sanders,* 51 Cal.3d 471, 273 Cal.Rptr. 537, 550, 797 P.2d 561, 574 (Cal. 1990) (en banc) (Spanish surname sufficient proof of ethnicity under *Batson* ), *cert. de-*

*nied,* 500 U.S. 948, 111 S.Ct. 2249, 114 L.Ed.2d 490 (1991). On the other hand, the defense used six out of seven of its peremptory strikes on "Anglos," i.e., those with non-Hispanic surnames. While *Batson* prevents intentional discrimination against "whites," *see, e.g., Government of the Virgin Islands v. Forte,* 865 F.2d 59, 64 (3d Cir.1989), *aff'd,* 904 F.2d 694 (1990), *cert. denied,* 500 U.S. 954, 111 S.Ct. 2262, 114 L.Ed.2d 714 (1991); *Roman v. Abrams,* 822 F.2d 214, 227–28 (2d Cir.1987), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1311, 103 L.Ed.2d 580 (1989), no report-ed cases have been found using the "Anglo" label, which appears largely unique to the Southwest, *see* Rubén Cobos, *A Dictionary of New Mexico and Southern Colorado Spanish* 10 (defining "anglo" as an adjective or noun "applied loosely in New Mexico and southern Colorado to any white European mixture"). Nonetheless, Anglos are a cogni-zable racial group in New Mexico, and dis-qualification of prospective Anglo jurors be-cause they are of one ethnicity, or are not of another, is prohibited.

■ We now apply these principles to the record before us. In the present case, the prosecutor offered several explanations other than race for his exclusion of Hispanic sur-named prospective jurors. He argued that two were "young," and, since Guzman was young, they might identify with her. This does not pass *Batson* scrutiny, since Defen-dants were a mother and daughter, and older prospective jurors who might identify with Gutierrez were allowed to sit. Moreover, the prosecutor did not use peremptory strikes to eliminate two Anglo prospective jurors who were also in their twenties. The prosecution also argued that two of the Hispanic prospec-tive jurors were stricken because they had "less responsible jobs involving less edu-cation." Again, however, two of the Anglo prospective jurors accepted had education and jobs somewhat comparable to the strick-en Hispanics. Because of the presence of Anglo jurors whose characteristics were com-parable to those relied upon to exclude His-panic jurors, the State failed to satisfy its burden of providing a racially neutral expla-nation. *See Jones v. Ryan,* 987 F.2d 960, 973 (3d Cir.1993); *United States v. Chinchilla,*

874 F.2d 695, 699 (9th Cir.1989). A new trial is the appropriate remedy on the present record. *See Jackson v. State*, 594 So.2d 1289, 1294 (Ala.Crim.App.1991), *cert. denied* (Ala. Feb. 28, 1992).

The State argues that Guzman waived this issue because only counsel for Gutierrez raised the issue in the district court. While a defendant can waive this issue, we read the record to indicate counsel for Gutierrez to be raising the issue on behalf of both Defendants. For example, immediately after the process of challenging prospective jurors resumed, counsel for Gutierrez said, "[w]e strike[,]" to which the court responded: "Which 'we?'" A new trial is therefore required for both Defendants.

III. *CONCLUSION*

For the above reasons, a new trial is required. This case is therefore reversed and remanded for a new trial.

IT IS SO ORDERED.

HARTZ and FLORES, JJ., concur.