2002-NMCA-036

42 P.3d 851

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Rufino MARTINEZ, Defendant–
Appellant.**

**No. 22,059.**

Court of Appeals of New Mexico.

Feb. 13, 2002.

Certiorari Denied, No. 27,378,
March 18, 2002.

Patricia A. Madrid, Attorney General, James O. Bell, Assistant Attorney General, Santa Fe, NM, for Appellee.

Phyllis H. Subin, Chief Public Defender Kathleen T. Baldridge, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## *OPINION*

PICKARD, Judge.

{1} Defendant was convicted of battery on a peace officer after he kicked and spit on a prison guard while engaged in a struggle with that guard. Defendant challenges his conviction on three grounds. First, Defendant contends that the trial court's limitation on the time allowed for voir dire violated his right to due process because he claims his counsel did not have sufficient time to inquire into the potential biases of venire members who had relatives in law enforcement. Second, Defendant contends that he made a prima facie showing that the State used its peremptory challenges in a racially discriminatory manner because the State used all three of its challenges to remove Hispanics from the jury, and as a result the trial court should have required the State to provide a racially neutral explanation for its challenges in accordance with *Batson v. Kentucky,* 476 U.S. 79, 96–98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Finally, Defendant claims that there was insufficient evidence to convict him of battery on a peace officer because the act of spitting on the officer did not constitute a meaningful challenge to the officer's authority, and because the officer suffered only scratches and slight bruising when Defendant kicked him.

{2} We hold that Defendant made a prima facie showing that the State was using its peremptory challenges in a discriminatory

manner, and we therefore remand this case to the trial court to determine if the State had a racially neutral reason for exercising its third peremptory challenge against a Hispanic prospective juror. If the State is able to provide a racially neutral reason, then the conviction shall be affirmed, because we hold that (1) the trial court did not abuse its discretion in limiting the time allowed for voir dire because defense counsel had sufficient time to inquire into potential biases and (2) there was sufficient evidence for the jury to conclude that Defendant's act of spitting on a prison guard constituted a "meaningful challenge" to that officer's authority, or in the alternative to conclude that Defendant inflicted actual harm when he kicked the officer in the leg. If the State cannot provide a racially neutral reason for the use of its peremptory challenge, then the conviction must be overturned and a new trial ordered.

## FACTS

{3} Defendant was involved in a scuffle with guards at the Wackenhut Corrections Corporation prison facility in Hobbs, New Mexico. The altercation occurred while one guard (hereinafter "the officer") was taking Defendant to his cell. At the time, Defendant was handcuffed and his legs shackled, with a "black box" securing chains between the cuffs and the leg shackles to further limit Defendant's movements. The officer either grabbed or placed his hand on Defendant's arm as he was leading Defendant into the cell. Defendant jerked away. When the officer touched Defendant's arm a second time, Defendant jerked away again. The officer then pushed Defendant to the ground. At that point, Defendant spit toward the officer's face; some of the spit landed in the officer's mouth. Three other officers came to assist and restrained Defendant by placing him face down on the ground. While the officers were on top of him, Defendant continued to struggle, kicking his legs up and down. As he did so, he kicked the officer in the leg. The officer testified that he had some scratches and discoloration on his leg. He applied an ice pack to his leg after the incident, then continued working his shift. As a result of this incident, Defendant was charged with one count of battery on a peace officer, contrary to NMSA 1978, § 30–22–24(A) (1971).

## PROCEEDINGS

{4} On the day of trial, the trial court reminded counsel of the court's standing policy limiting voir dire to fifteen minutes for each side. During the trial court's initial voir dire, several members of the venire indicated that they had friends or family in law enforcement, some with a connection to the Hobbs facility in particular. The prosecutor, in her fifteen-minute voir dire, asked some questions about these connections. Defense counsel then began questioning the panel. She asked some questions relating to these connections, but spent most of her time on other topics. After fifteen minutes, defense counsel asked for an extension of time to inquire about the panel members' connections to law enforcement. The trial court allowed defense counsel an extra five minutes. When the additional five minutes were up, defense counsel again sought an extension. The court denied the request this time. In chambers, defense counsel objected to the trial court's limitation on voir dire, expressing concern that she did not have enough time to ask seven of the venire members about their acknowledged connections to law enforcement. The trial court overruled the objection. The court then struck for cause seven other venire members who had been questioned about their connections to law enforcement.

{5} Of the seven prospective jurors that defense counsel indicated she wanted to question further, only one was selected to serve as a juror. Of the thirteen jurors, only three had any connection to law enforcement. The first knew a police officer in Texas. The second knew one active and one retired police officer. A third had a brother-in-law who previously worked for Hobbs as a detention officer. Each of these three jurors assured the trial court that they could remain impartial.

{6} In accordance with the Rules of Criminal Procedure, the trial court allowed Defendant five peremptory challenges and the State three. *See* Rule 5–606(D) NMRA 2002. After the State used its first two peremptory challenges to strike prospective jurors with

Hispanic surnames, Defendant objected and asked that the State provide a racially neutral explanation for its challenges under *Batson*, which prohibits the use of peremptory challenges to exclude people from jury service on the basis of race. The trial court asked the prosecutor to explain why she struck both potential jurors. As to the first challenge, the prosecutor indicated that she "didn't get a real good feeling" about that panel member because she had made little eye contact. As to the second challenge, the prosecutor indicated that the panel member never spoke up to answer a question and never made eye contact with the prosecutor. Although acknowledging that the panel member could have had difficulty because she required an interpreter, the prosecutor noted that two other panel members who required an interpreter were more responsive to questioning. The trial court found those explanations to be racially neutral and excused both the prospective jurors.

{7} Later, the defense again asked for a racially neutral explanation when the State used its third and final peremptory challenge to strike another prospective juror with a Hispanic surname. This time, the trial court found that Defendant had not made out a prima facie showing that the State was discriminating against Hispanics in the use of its peremptory challenges. The court, in making its ruling, noted that fifteen of the thirty-three prospective jurors on the panel were Hispanic. Of the thirteen jury members selected (twelve jurors and one alternate), seven were Hispanic.

{8} After jury selection, the case proceeded to trial, and the jury found Defendant guilty of battery on a peace officer.

**DISCUSSION**

**The State's Use of Peremptory Challenges**

{9} Defendant claims that the State's use of peremptory challenges against Hispanics violated his equal protection rights. It is well established that the State may not, during the jury selection process, use its peremptory challenges to exclude otherwise unbiased and well-qualified individuals solely on the basis of their race. *Batson*, 476 U.S. at 85–88, 106 S.Ct. 1712; *State v. Jones*, 1997–NMSC–016, ¶ 3, 123 N.M. 73, 934 P.2d 267. Such exclusions violate the equal protection rights of both the defendant and the prospective jurors. *Batson*, 476 U.S. at 85–88, 106 S.Ct. 1712.

{10} In *Batson*, the United States Supreme Court outlined a three-step procedure for trial courts to determine whether a prosecutor has discriminated on the basis of race in using peremptory challenges. *Batson*, 476 U.S. at 94–95, 106 S.Ct. 1712; *Jones*, 1997–NMSC–016, ¶ 3, 123 N.M. 73, 934 P.2d 267. A defendant must first make a prima face showing that the State used its peremptory challenges in a racially discriminatory way. *Jones*, 1997–NMSC–016, ¶ 3, 123 N.M. 73, 934 P.2d 267. If the defendant makes a prima facie showing, then the State must provide a racially neutral explanation for its challenges. *Id.* If the trial court finds that the State's explanation is racially neutral, then the burden again falls on Defendant to show that the reason given is in fact pretext for a racially discriminatory motive. *Id.*

{11} The question in this case is whether Defendant established a prima facie case of discrimination under *Batson*. To make a prima facie showing of discrimination against a racial group, a defendant must show that (1) the State exercised its peremptory challenges to remove members of that group from the jury panel and (2) these facts and other related circumstances raise an inference that the State used its challenges to exclude members of the panel solely on account of their race. *State v. Jim*, 107 N.M. 779, 781, 765 P.2d 195, 197 (Ct.App.1988); *see also Powers v. Ohio*, 499 U.S. 400, 414–16, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (eliminating additional requirement that a defendant must be of the same racial group as the excused venire members to raise a *Batson* challenge). The trial court ruled that the circumstances in this case did not raise an inference that the State was using its challenges in a discriminatory manner. In so finding, the trial court pointed out that fifteen of thirty-three venire members were Hispanic, and seven Hispanics were selected to serve on the jury. As a result, the trial court concluded that there was no pattern of

discrimination. In support of the trial court's decision, the State argues that Defendant needed to show that Hispanics had either been eliminated from the jury altogether or were substantially underrepresented on the jury, or that this was a case that was particularly sensitive to racial bias. The State is correct that any of those circumstances will support an inference of racial discrimination. *See Jim,* 107 N.M. at 781, 765 P.2d at 197. The State is also correct that none of those circumstances are present in this case. The percentage of Hispanics on the selected jury was actually higher than the percentage of Hispanics represented in the venire panel. In addition, Defendant does not argue that this case is particularly susceptible to racial discrimination.

{12} However, those three particular circumstances, drawn from *Batson,* 476 U.S. at 95, 106 S.Ct. 1712, are *not the only circumstances* that give rise to an inference of discrimination. In fact, New Mexico case law provides support for Defendant's position that he did indeed make a prima facie showing of discrimination in this case. *See State v. Guzman,* 119 N.M. 190, 193–94, 889 P.2d 225, 228–29 (Ct.App.1994); *State v. Gonzales,* 111 N.M. 590, 595–97, 808 P.2d 40, 45–47 (Ct.App.1991), *modified on other grounds by State v. Dominguez,* 115 N.M. 445, 452, 853 P.2d 147, 154 (Ct.App.1993). Unfortunately, neither the State nor Defendant brought these cases to the attention of the trial court. Nonetheless, we must determine whether these cases compel us to reverse the trial court's decision.

{13} In *Gonzales,* the State used eight out of ten challenges against Hispanics. 111 N.M. at 593, 808 P.2d at 43. The resulting jury was made up of four Hispanics, one Native American, and seven Anglos. *Id.* In that case, we held that the defendant had made a prima facie showing of discrimination based on the State's pattern of eliminating Hispanics from the jury, even though Hispanics were neither absent nor underrepresented on the jury. *See id.* at 597, 808 P.2d at 47. We held that "a showing that the state used eighty percent of its peremptory challenges to eliminate members of his racial group from the jury was a prima facie show-

ing of intentional discrimination," *id.* at 596–97, 808 P.2d at 46–47, and reversed the trial court's contrary decision. *Id.* at 597, 808 P.2d at 47. In *Guzman,* the State used all five of its peremptory challenges against Hispanics. *Guzman,* 119 N.M. at 191, 889 P.2d at 226. The trial court found that the defendant had not made a prima facie showing of discrimination because several Hispanics had been selected to serve on the jury. *Id.* at 193, 889 P.2d at 228. We reversed. *Id.* at 195, 889 P.2d at 230.

{14} In both *Guzman* and *Gonzales,* we stressed that the presence of members of a particular group, standing alone, does not defeat a defendant's attempt to establish a prima facie case of discrimination. *See Guzman,* 119 N.M. at 193–94, 889 P.2d at 228–29; *Gonzales,* 111 N.M. at 597, 808 P.2d at 47. We explained that a too-heavy emphasis on the representative character of the jury confuses the concepts of equal protection, on the one hand, and the guarantee of an impartial jury, on the other, and that the use of a single peremptory challenge for racially motivated reasons violates equal protection, even when the jury still retains its representative character. *See Guzman,* 119 N.M. at 193, 889 P.2d at 228. In reversing the trial court in *Guzman,* we explained that "the district court may have operated under a misapprehension that the prohibition against using peremptory challenges to discriminate against prospective jurors on racial or ethnic grounds is based exclusively on a defendant's right to have a representative cross-section of the community on the jury." *Id.* In correcting this notion, we stressed that the United States Supreme Court in *Batson* was concerned with protecting the rights of the individual prospective jurors, as well as the rights of the defendants. *See Guzman,* 119 N.M. at 193–94, 889 P.2d at 228–29. Similarly, we explained in *Gonzales* that "[a] single prospective juror may be stricken for a racially motivated reason and the jury nonetheless retain its 'representative character.' This, nevertheless, offends equal protection." *Gonzales,* 111 N.M. at 595, 808 P.2d at 45.

{15} In contrast, we were not convinced the defendant established a prima facie case of discrimination in *Dominguez,* 115 N.M.

445, 853 P.2d 147. In *Dominguez,* the State had seventeen peremptory challenges available. It used only six of those challenges, but used all six to strike Hispanics from the jury. *Id.* at 450, 853 P.2d at 152. However, the State also accepted several Hispanic jurors for service, even though it had more challenges available. *Id.* at 450–51, 853 P.2d at 152–53. Because the State did not use the additional challenges it had available, we upheld the trial court's decision that the defendant had not made a prima facie showing of discrimination. *See id.* at 451–52, 853 P.2d at 153–54.

{16} In this case, the trial court seemed to rely exclusively on the representative character of the jury in finding that Defendant failed to make a prima facie showing of discrimination. The above-cited cases, therefore, would seem to dictate reversal. We see no relevant factual distinction that sets this case apart from *Gonzales* or *Guzman.* This case is somewhat different than *Gonzales* in that the State's use of peremptory challenges in this case had a less substantial impact on the racial makeup of the jury. However, there was no evidence in *Guzman* that the State's use of peremptory challenges substantially altered the racial makeup of the jury, and we still found that the defendant had established a prima facie case. The only difference between this case and *Guzman* is the number of challenges available to the State, which is prescribed by rule. In both cases, however, the State used all of its peremptory challenges, and therefore it could not have eliminated any more Hispanic jurors. If the State used those three challenges with the intent to minimize the presence of Hispanics on the jury, then the State's action would constitute an equal protection violation, even though the jury retained its representative character. Thus, Defendant's attempt to establish a prima facie case should not fail simply because the State only had three peremptory challenges available.

{17} Nonetheless, we are not convinced that this error automatically warrants reversal. The *Batson* analysis has evolved somewhat since the Supreme Court issued its decision in 1986. As this case law has devel-oped, our courts have recognized the need to give deference to the decisions of trial courts. *See State v. Jones,* 1996–NMCA–020, ¶¶ 7–9, 121 N.M. 383, 911 P.2d 891, *aff'd,* 1997–NMSC–016, 123 N.M. 73, 934 P.2d 267. The above-cited cases, however, treated the question of whether a prima facie case had been established as a question of law, subject to de novo review on appeal. In *Gonzales,* we relied on a case from Maryland, *Stanley v. State,* 313 Md. 50, 542 A.2d 1267 (1988). *See Gonzales,* 111 N.M. at 595, 808 P.2d at 45. In that case, the Maryland appellate court felt it necessary to exercise its "independent constitutional judgment" in determining whether the defendant had established a prima facie case, in part because the deciding trial court was unfamiliar with *Batson. Stanley,* 542 A.2d at 1277. Because of this difference in analysis, we think this case requires us to decide whether to reaffirm the principle that, as a matter of law, the use of a disproportionate number of strikes against a particular group establishes a prima facie case of discrimination, or whether, in the alternative, that determination is left to the sound discretion of the trial court.

*Standard of Review*

{18} The *Batson* Court emphasized the important role trial courts must play in reviewing claims that a litigant is using peremptory challenges in a discriminatory manner. The Court explained that the trial court must undertake a "sensitive," factual inquiry in order to determine if the party raising the claim has proven discriminatory intent. *See Batson,* 476 U.S. at 93, 95, 106 S.Ct. 1712. The Court also indicated that it is up to the trial court to determine whether the party raising the claim has established a prima facie case of discrimination. The Court explained that "[w]e have confidence that trial judges, experienced in supervising *voir dire,* will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Id.* at 97, 106 S.Ct. 1712.

{19} Recognizing the factual nature of the *Batson* inquiry, our Supreme Court has indicated that a trial court's decision in a *Batson*

claim should generally be reviewed under an abuse of discretion standard. *Jones,* 1997–NMSC–016, ¶¶ 10–11, 123 N.M. 73, 934 P.2d 267. We do not read *Jones,* however, as requiring absolute deference to the decisions of trial courts. The question before the *Jones* Court was whether a prosecutor's reason for striking an African American juror was legally sufficient. *Id.* ¶¶ 3, 11. It was undisputed in that case that the defendant had established a prima facie case of discrimination. The Court held that a deferential review was appropriate as to the trial court's factual findings. *Id.* ¶ 11. Yet the Court also reiterated that it was the role of the appellate court to determine if the prosecutor's reason was constitutionally adequate. *See id.*

{20} Deference to the trial court is especially important in evaluating the reasons a prosecutor gives for making a challenge, as well as the reasons a defendant puts forth for claiming those reasons are pretextual. *See Heno v. Sprint/United Mgmt. Co.,* 208 F.3d 847, 854 (10th Cir.2000) (holding that the trial court's ultimate finding as to whether there was a violation is reviewed for clear error only). At that stage of the *Batson* analysis, the trial court must evaluate the sincerity of both parties and rely on its own observations of the challenged jurors. The trial court must also draw on its experience in supervising voir dire. It is appropriate for an appellate court to defer to the trial court in these findings. In some circumstances, a trial court will be called on to make similar factual findings in order to determine whether or not a defendant has established a prima facie case of discrimination. On the other hand, in many cases, like this one, the defendant's claim will be based purely on the number of challenges used against a particular group. *See* Kenneth J. Melilli, *Batson in Practice: What We Have Learned About Batson and Peremptory Challenges,* 71 NOTRE DAME L.REV. 447, 470–78 (1996) (discussing heavy reliance on numerical analysis in determining whether a party has established a prima facie case of discrimination) (hereinafter Melilli).

{21} In this case, the parties do not dispute the relevant facts, such as how many prospective jurors were Hispanic and how many strikes the prosecution used to remove Hispanics from the jury pool. The trial court made no other factual findings. Like the Court in *Jones,* we think it is appropriate for us on appeal to determine whether Defendant has met the legal threshold to establish a prima facie case of discrimination. Thus, we think our review of *Batson* claims at this stage is similar to our review for sufficiency of evidence, where we give deference to the fact-finder's resolution of factual conflicts and inferences derived therefrom, but also make a legal determination as to whether the evidence viewed in this manner could support a particular conviction. *See State v. Orgain,* 115 N.M. 123, 126, 847 P.2d 1377, 1380 (Ct.App. 1993) (explaining that a sufficiency of evidence review involves a two-step process).

### What Level of Proof is Required to Establish a Prima Facie Case?

■ {22} As noted above, *Batson* set out a three-step analysis for claims that a party's use of peremptory strikes violates equal protection. The *Batson* Court modeled this approach after the analysis of claims of racial discrimination in employment brought under Title VII of the Civil Rights Act. *See Batson,* 476 U.S. at 94 n. 18, 106 S.Ct. 1712. In Title VII cases, the plaintiff must set out preliminary facts establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *modified on other grounds by Hazen Paper Co. v. Biggins,* 507 U.S. 604, 612, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Prior to *Batson,* the United States Supreme Court indicated that the burden on plaintiffs at that stage is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A plaintiff need only provide enough evidence to permit the trier of fact to infer the facts at issue. *Id.* at 254 n. 7, 101 S.Ct. 1089. The burden then shifts to the defendant-employer to produce evidence. *Id.* at 253, 101 S.Ct. 1089. The purpose of these initial steps is to frame the factual issues and progressively sharpen the inquiry. *Id.* at 255, 101 S.Ct. 1089.

{23} Some state courts, relying on the *Batson* Court's analogy to Title VII cases, have adopted a lenient approach in analyzing the first step of the *Batson* inquiry. *See, e.g., Wardlow v. State*, 6 S.W.3d 786, 787 (Tex.Ct.App.1999) (holding that only minimal evidence is needed to support a rational inference of discriminatory intent); *Linscomb v. State*, 829 S.W.2d 164, 167 (Tex.Crim.App. 1992) (en banc) ("A prima facie case is what raises the issue, not what eventually disposes of it."). Recently, the United States Supreme Court reaffirmed that plaintiffs in Title VII suits do not face a particularly high threshold in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Describing the requirements for a prima facie case as "minimal," the Court explained that additional evidence is needed before a court can find that an employer discriminated on the basis of race. *Id.* at 506, 515, 113 S.Ct. 2742.

■ {24} In other types of cases where courts have found sufficient evidence to support a prima facie case, that evidence, standing alone, does not prove that the party making the challenge was actually engaging in discrimination. Courts are in near universal agreement, for example, that a party's decision to strike all the members of a particular race establishes a prima facie case of discrimination. Jay M. Zitter, Annotation, *Use of Peremptory Challenges to Exclude Ethnic and Racial Groups, Other than Black Americans, from Criminal Jury–Post–Batson State Cases*, 20 A.L.R.5th 398 at §§ 7, 9 (1994). Courts are also willing, however, to accept a racially neutral explanation for these strikes. *See Jones*, 1997–NMSC–016, ¶ 3, 123 N.M. 73, 934 P.2d 267. The question before a trial court, when deciding whether a party has established a prima facie case of discrimination, is whether there is sufficient evidence to support an inference of discriminatory intent, not whether that party has already proved its case. *See Gonzales*, 111 N.M. at 596, 808 P.2d at 46 ("The important inquiry is whether defendant can point to some facts or circumstances from which a trial court could reasonably infer that the prosecution has intentionally used its peremptory challenges to eliminate jurors on the basis of race, rather than for racially neutral reasons related to the juror's ability to fairly and impartially hear the case.").

### Is the Use of a Disproportionate Number of Strikes Against One Racial Group a Prima Facie Case of Discrimination?

■ {25} Having determined the appropriate level of deference to give to the decision of the trial court, and having determined that a defendant bringing a *Batson* claim is not held to a particularly onerous level of proof at the prima facie stage, we see no reason to retreat from our decided case law holding that a disproportionate use of peremptory strikes against one racial group gives rise to an inference of discriminatory intent. In fact, in reviewing other jurisdictions, we found that many also hold that, as a matter of law, a disproportionate number of strikes against a particular group creates a prima facie case of discrimination. *See, e.g., State v. Clark*, 324 N.J.Super. 558, 737 A.2d 172, 178 (App.Div.1999) ("It is clear that a prosecutor may be found to have exercised individual peremptory challenges in a discriminatory manner even though the jury ultimately selected includes a substantial percentage of the minority group against whom such challenges were directed."); *Linscomb*, 829 S.W.2d at 167 ("an unexpectedly high rate of challenges against a particular group is, as an empirical matter, some evidence of an intent to exclude persons on account of membership in that group"). This is particularly true when the prosecution did not have additional strikes available. *Cf. United States v. Johnson*, 4 F.3d 904, 913–14 (10th Cir.1993) ("The presence of members of the subject race on the final jury is a relevant factor in negating an alleged *Batson* violation *when the government has the opportunity to strike the juror.*") (emphasis added). In Alabama, the state courts initially took the position adopted by the State here, and thus required proof of an impact on the racial makeup of the jury as well as proof that the prosecution used a disproportionate number of strikes against a particular racial group. *See Harrell v. State*, 571 So.2d 1270, 1271 (Ala.1990), *overruled by Ex Parte Thomas*, 659 So.2d 3, 8 (Ala.1994). That state later decided that a defendant can establish a pri-

ma facie case solely on the fact that a prosecutor used a disproportionate number of peremptory challenges to strike members of a particular racial group. *See Thomas,* 659 So.2d at 4–8.

{26} Indeed, the Supreme Court in *Batson* indicated that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Batson,* 476 U.S. at 97, 106 S.Ct. 1712. The trial court in this case indicated that he saw no pattern in the prosecution's strikes, even though all three strikes were against members of the same racial group. Despite the trial court's statement, the court was clearly focusing on the impact of the State's strikes, not the pattern of strikes against a particular group.

{27} Of course, some states have concluded that a defendant must show, at the prima facie stage, that the prosecutor's use of peremptory challenges has a discriminatory impact on the racial makeup of the jury. *See, e.g., Willis v. State,* 201 Ga.App. 727, 411 S.E.2d 714, 715 (1991) ("Since the record here indicates that after the jury selection had ended, the percentage of blacks on the jury had increased from the number of blacks on the panel, [the defendant] failed to make a prima facie showing of discrimination."); *Johnson v. State,* 761 P.2d 484, 490 (Okla.Crim.App.1988) (rejecting a *Batson* claim because "[w]hether or not the prosecutor was trying to discriminate ..., the plan ... failed"). These differing results among jurisdictions reflects the difficulties in relying on numbers to establish an inference of discriminatory intent. *See* Melilli, *supra,* at 470. Professor Melilli, in his analysis of state court application of *Batson,* argued that the best method to analyze peremptory strikes is to compare the percentage of challenges used against a particular racial group to the percentage of that group in the venire, because "neutrally exercised peremptory challenges ought, on average, to affect targeted-group members in proportion to their membership on the venire as a whole." Melilli, *supra,* at 472, 478. Texas has adopted this approach, and in its cases looks at whether the number of strikes used against a particular group are "larger than one would

expect if race had nothing to do with it." *Linscomb,* 829 S.W.2d at 166; *see also United States v. Esparsen,* 930 F.2d 1461, 1467 (10th Cir.1991) ("the prosecution's use of 71% (5/7) of its challenges against Hispanics would acquire some statistical meaning if we knew the percentage of Hispanics in the venire").

{28} An analysis of percentages becomes somewhat skewed when only three challenges are available, as will be the case in prosecutions against a single defendant. *See* Rule 5–606(D). Nonetheless, the prosecution in this case used 100% of its strikes against Hispanics, even though Hispanics made up 45% of the venire. It would be expected that one or two of the prosecution's challenges will go against Hispanic venire members. But where the prosecution used all three of its strikes against one racial group, it should be conscious of the perception that it is using these challenges in a discriminatory manner, and it should be willing to put forward a reason for those challenges in order to eliminate that perception. The prosecution in this case had only three peremptory challenges available to use with a venire of thirty-three prospective jurors (twenty-six after seven jurors were excused for cause). The prosecutor surely put some thought into which jurors it should eliminate in order to get the most advantageous jury.

{29} Of course, the fact that the prosecution used all of its peremptory challenges against one racial group only creates an inference of discrimination. The same is true in other situations where we accept statistical evidence as sufficient to create a prima facie case of discrimination. For example, we find a prima facie case is made where the prosecution uses a peremptory challenge to remove the sole member of a particular racial group from the jury. *See Jones,* 1996–NMCA–020, ¶ 10, 121 N.M. 383, 911 P.2d 891. That, however, does not conclusively prove that the prosecutory motivation for striking that juror was discriminatory. *See Jones,* 1997–NMSC–016, ¶¶ 4–5, 123 N.M. 73, 934 P.2d 267. The defendant still bears the burden of proving discriminatory intent. *Id.* ¶ 3.

{30} In this case, the prosecution's use of all three of its peremptory challenges against Hispanics created an inference of discrimination sufficient to support a prima facie case. The trial court, therefore, should have required the State to provide an explanation for the use of its third and final challenge. Accordingly, we remand this case to the trial court to hold a hearing on this issue. At the hearing, the State shall be required to provide an explanation for that challenge. If the State is able to provide a reason, the trial court shall continue with the *Batson* analysis and determine if the State's reason was racially neutral. If the State is able to do so, then the conviction shall be affirmed because, as we discuss below, we do not find merit in Defendant's additional claims of error. If, due to the time lapse, the State is unable to provide a reason, or if the trial court finds that the reason given is not racially neutral, then the conviction shall be set aside and a new trial ordered.

### The Trial Court's Limitation on the Time Allowed for Voir Dire

{31} Defendant contends he was denied a right to a trial before a fair and impartial jury because the trial court did not allow defense counsel additional time to question potential jurors about their connections to law enforcement. A defendant has a Sixth Amendment right to a trial by a neutral and impartial jury. *State v. Sosa*, 1997–NMSC–032, ¶ 14, 123 N.M. 564, 943 P.2d 1017. Voir dire assists in the selection of such a jury. *Id.* Trial courts, however, are given broad discretion in overseeing the voir dire process. *Id.* A criminal conviction will be reversed only where the trial court has clearly abused its discretion in limiting voir dire. *See State v. Clark*, 1999–NMSC–035, ¶ 20, 128 N.M. 119, 990 P.2d 793.

{32} The trial court in this case has a standing policy of limiting the time allowed voir dire to fifteen minutes for each side. If the parties seek additional time, they must convince the court that additional questioning is necessary. Defense counsel argued that additional questioning was necessary because she did not have enough time to question all the venire members who indicated they had connections to law enforcement. Those jurors, however, were specifically questioned by the trial court about their connections to law enforcement. In addition, defense counsel was aware of the time constraint when she began voir dire. Defense counsel questioned a number of other panel members about their law enforcement connections. Had counsel spent less time with each individual juror, and spent less time raising other issues, she would have had sufficient time to question all of the panel members who had mentioned a connection to law enforcement. Twenty minutes was sufficient time to question all the venire members who acknowledged ties to law enforcement.

{33} The trial court's policy is designed to move cases along and prevent counsel from using voir dire to instruct the jury or ask repetitious questions. In addition, the court could reasonably find that enough information had been developed during the voir dire process. The court, in fact, from the outset was sensitive to the potential bias that panel members with connections to law enforcement might have in hearing a case where a defendant is accused of battering a prison guard. The court's first questions, after determining whether any panel members were personally acquainted with any of the parties, counsel, or witnesses, related to the panel members' ties to law enforcement. The trial court did not abuse its discretion in determining that this was sufficient time to explore that topic.

{34} In addition, Defendant has not shown that the court abused its discretion in determining that the jurors selected could be fair and impartial. Of the thirteen jury members selected, only three had any connection to law enforcement. Each of these three jurors assured the trial court that they could remain impartial. The court was within its discretion to accept those assurances.

{35} Although Defendant focuses his challenge on the trial court's general policy of limiting the time allowed for voir dire, we think this is no different than other cases in which a trial court has exercised its discretion in determining how much questioning is necessary on a particular topic. For example, we upheld a trial court's decision to limit

questioning on juror's attitudes toward alcohol use in a case in which the defendant claimed he was too drunk to form criminal intent. *See State v. Fransua,* 85 N.M. 173, 174–75, 510 P.2d 106, 107–08 (Ct.App.1973). Similarly, our Supreme Court upheld a trial court's decision to limit questions on juror's experiences with gangs in a case in which the defendant was charged with gang activity. *See Sosa,* 1997–NMSC–032, ¶¶ 14–15, 123 N.M. 564, 943 P.2d 1017. The trial court, who is listening first hand to counsel's questions and the panel members' responses, is in the best position to determine whether voir dire has sufficiently exposed any biases that may preclude jurors from acting fairly and impartially. We hold that the trial court did not abuse its discretion in limiting defense counsel's voir dire questions on connections to law enforcement.

### Sufficiency of the Evidence

{36} Defendant argues that there was insufficient evidence to convict him of battery on a peace officer. In analyzing the sufficiency of evidence, the inquiry is whether substantial evidence exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction. *State v. Sosa,* 2000–NMSC–036, ¶ 6, 129 N.M. 767, 14 P.3d 32. This is not a case where Defendant disputes what occurred. In fact, Defendant presented no evidence to dispute the officer's version of events. Instead, Defendant argues that his conduct did not rise to the level necessary to convict him of the charge of battery on a peace officer.

{37} Battery on a peace officer is "the unlawful, intentional touching or application of force to the person of a peace officer while he is in the lawful discharge of his duties, when done in a rude, insolent or angry manner." Section 30–22–24(A). Our Supreme Court, in construing this statute, determined that not every act of battery will be sufficient for a conviction on this charge. *See State v. Padilla,* 1997–NMSC–022, ¶¶ 5–6, 123 N.M. 216, 937 P.2d 492. Instead, the Court held that the battery must result in actual injury to the officer, represent a threat to the offi-

cer's safety, or present a "meaningful challenge" to the officer's authority. *Id.* ¶ 7.

{38} The State seems to argue that Defendant could be convicted based solely on the finding that he spit on the officer. However, we recently held that the act of spitting will not automatically provide a basis for conviction for this offense. *See State v. Jones,* 2000–NMCA–047, ¶¶ 12, 15, 129 N.M. 165, 3 P.3d 142. We noted that spitting is, by its nature, abusive, but held that it is up to the jury to decide whether the act of spitting also constituted a meaningful challenge to authority. *Id.* ¶ 12. We specifically declined to define what types of behavior will be sufficient to constitute a meaningful challenge to authority and what will not. *Id.* ¶ 14. Instead, we stressed that whether or not a defendant's conduct constituted a meaningful challenge would depend on the context in which the battery occurred. *Id.*

{39} Defendant argues that because he was shackled and was being physically restrained when he spit at the officer, nothing he did constituted a meaningful challenge to the officer's authority. Defendant explains that the officer was never in danger. The question of whether Defendant's actions constituted a threat to the officer's safety, however, is separate from the question of whether his actions constituted a meaningful challenge. Under *Padilla,* conduct is punishable if it constitutes either a threat to safety or a meaningful challenge to authority, or if it results in actual injury. *Padilla,* 1997–NMSC–022, ¶ 7, 123 N.M. 216, 937 P.2d 492. In *Jones,* we indicated that spitting could constitute either a threat to safety or a meaningful challenge to authority, depending on the circumstances. *Jones,* 2000–NMCA–047, ¶ 12, 129 N.M. 165, 3 P.3d 142. Defendant is probably correct that he was not in a position to cause substantial harm to the officer. Indeed, the jury was not asked to consider whether Defendant's actions posed an actual threat to the officer's safety. Nonetheless, Defendant's actions could still constitute a meaningful challenge to the officer's authority, and we hold there was sufficient evidence to support the jury's finding that Defendant's conduct constituted a meaningful challenge to the officer's authority.

{40} The incident began with Defendant's attempt to reject the officer's authority by pulling away from him, twice, while the officer was trying to lead Defendant to his cell. When the officer restrained Defendant, Defendant continued to resist the officer's authority. It was at that point Defendant spit in the officer's face. Even after three other officers came to assist the officer in restraining Defendant, Defendant continued to struggle. Even though he was wearing shackles, he managed to kick the officer, resulting in scratching and bruising. All of Defendant's actions constituted a challenge to the officer's authority. Given this evidence regarding the context in which the battery arose, it was appropriate for the trial court to submit to the jury the question of whether Defendant's conduct presented a meaningful challenge to the officer's authority, and there was sufficient evidence for the jury to decide that it did. Therefore, there was sufficient evidence to convict Defendant of battery on a peace officer.

{41} As noted above, the jury also could have found Defendant guilty if the officer suffered a physical injury when Defendant kicked him. *See Padilla*, 1997–NMSC–022, ¶ 7, 123 N.M. 216, 937 P.2d 492. Defendant argues that, because the officer's injuries were relatively minor, there was insufficient evidence to support a finding that the officer suffered actual harm. Once again, this was a question for the jury. Although the officer's injuries were admittedly minor, they were in fact injuries, and therefore there was sufficient evidence for the jury to find that the officer suffered actual harm.

## CONCLUSION

{42} We hold that Defendant has established a prima facie case of discrimination under *Batson*, and we therefore remand this case to the trial court to determine whether the State can provide a racially neutral explanation for its third peremptory challenge. If the State can provide a racially neutral explanation, then the conviction will be affirmed, because we hold that (1) the trial court did not abuse its discretion in limiting the time allowed for voir dire and (2) there was sufficient evidence to convict Defendant of battery on a peace officer. If the State cannot provide a racially neutral explanation, then the conviction must be set aside and a new trial ordered.

{43} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER and CELIA FOY CASTILLO, Judges.